

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| STEVE SEGAL, NICK HAMMER, ROBIN HOUGDAHL, and TODD TERRY, on behalf of themselves and all others similarly situated, | Case No.: _____ |
| Plaintiffs, | |
| v. | |
| RAYMOND BITAR; NELSON BURTNICK; FULL TILT POKER, LTD.; TILTWARE, LLC; VANTAGE, LTD; FILCO, LTD.; KOLYMA CORP. A.V.V.; POCKET KINGS LTD.; POCKET KINGS CONSULTING LTD.; RANSTON LTD.; MAIL MEDIA LTD.; HOWARD LEDERER; PHILLIP IVEY JR.; CHRISTOPHER FERGUSON; JOHNSON JUANDA; JENNIFER HARMAN-TRANIELLO; PHILLIP GORDON; ERICK LINDGREN; ERIK SEIDEL; ANDREW BLOCH; MIKE MATUSOW; GUS HANSEN; ALLEN CUNNINGHAM; PATRIK ANTONIUS and JOHN DOES 1-100, | CLASS ACTION COMPLAINT and ACTION UNDER 18 USCS § 1961 *et. seq.*<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

## INTRODUCTION

Plaintiffs make the following allegations, based upon the investigation of their counsel, except as to the allegations specifically pertaining to plaintiffs and their counsel. Counsels' investigation conducted on plaintiffs' behalf, included, among other things: (i) an analysis of publicly-available news articles and reports; (ii) a review and analysis of public and foreign filings and (iii) press releases issued by Defendants and by the Department of Justice. Plaintiffs also rely on the Verified Complaint filed by the Department of Justice ("DOJ Civil Complaint") in the Southern District of New York, (DOJ Civil Complaint, 11-Civ-2564 (S.D.N.Y., Apr. 15,

2011)) attached herein at Exhibit A, and incorporated by reference; and, on the Superseding

Indictment ("DOJ Criminal Indictment") filed by the Department of Justice in the Southern

District of New York, (10-CR-336 (LAK) (S.D.N.Y., filed under seal Mar. 10, 2011, unsealed

Apr. 14, 2011)), attached herein at Exhibit B, and incorporated by reference. At such time as

Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent

necessary and appropriate, further amend the operative Complaint, or, if required, seek leave to

amend to add such other additional facts as are discovered that further support each of the Counts

below.

## CLASS ACTION COMPLAINT

1.      Plaintiffs are U.S. residents and "real-money" internet poker players who held

accounts ("Player Accounts") on April 15, 2011, with the Full Tilt Poker internet gambling

operation. Ordinarily, Plaintiffs were free to draw on their Player Accounts to play poker in Full

Tilt card rooms, using Full Tilt software, available exclusively from the Full Tilt website.

Plaintiffs were also free to deposit and withdraw funds from their Player Accounts. But, since

April 15, 2011, Player Accounts have been frozen by Full Tilt, and Plaintiffs have been deprived

access to their own funds. Named Plaintiffs, Nick Hammer, Robin Hougdahl, Steve Segal and

Todd Terry ("Plaintiffs"), represent a nation-wide class of Full Tilt account holders residing in

the United States whose Player Accounts held balances on April 15, 2011 and whose accounts

have been effectively frozen by Defendants since that date. Plaintiffs bring suit to demand return

of U.S. player funds and for damages under the RICO statute, 18 USCS § 1961 *et. seq.*

Defendants—all associated with the Full Tilt operation—would never be in possession of U.S.

Players' fund, and U.S. Players' would never have suffered injury, but for the Defendants'

widespread scheme to commit wire fraud, bank fraud and money laundering in order to pad their own pockets.

2.      On April 15, 2011, the U.S. Attorney for the Southern District of New York seized the assets of the "Big Three" internet poker companies operating in the United States (Full Tilt Poker, PokerStars, and Absolute Poker).  Arrest warrants were issued for certain founders of these companies for, among other offenses, money laundering, conspiracy to commit wire fraud, and conspiracy to commit bank fraud.  The Department of Justice also filed a civil suit against the three companies for money laundering and for in rem forfeiture of all assets and proceeds derived from the illegal acts in which these companies allegedly engaged.

3.      On April 15th, known as "Black Friday" in the poker community, millions of U.S. residents held personal funds in individual, "secure" accounts with Full Tilt Poker.  "Full Tilt " is the umbrella entity behind the Full Tilt Poker website (fulltiltpoker.com), the Full Tilt Poker brand, the Full Tilt Team of professional poker players ,and numerous companies and individuals that operate for and under the umbrella entity (together, "Full Tilt").  Until April 15, U.S. customers regularly engaged in legal internet poker games for real-money, on the Full Tilt website, using Full Tilt software, and drawing on their Full Tilt accounts.

4.      Defendant Companies, along with the Individual Defendants (all owners, directors, officers or principals of the Defendant Companies) and outsiders, associated with each other in the form of an Enterprise ("Full Tilt Enterprise" or "Enterprise") to accomplish a common purpose: channel U.S. players' funds into Full Tilt Poker through any means necessary.

5.      As a result of regulatory changes, Full Tilt lost most legal means of accepting and processing U.S. player funds deposited through credit cards or electronic checking accounts (in the form of "eChecks").  The Defendants feared that requiring U.S. customers to deposit funds

through legal, but more burdensome methods (for example, cash transfers) would significantly injure Full Tilt's business in its most profitable geographic market. Accordingly, at all or some relevant time(s) between 2006 and March of 2011, Defendants joined together to form an Enterprise—an association-in-fact which operated under the name of, acted through, and/or held itself out as "Full Tilt." The Enterprise was formed for the purpose of processing U.S. player funds for Full Tilt. But, the Enterprise achieved that end through illegal means, significantly harming Plaintiffs' interests in their own assets. In fact, members of the Enterprise channeled U.S. player funds through a pattern of fraud, money laundering, and other racketeering activity to Full Tilt, the entity (and/or entities) in which they held ownership stakes.

6.     Specifically, among other offenses, the Enterprise created sham companies for the purpose of opening fraudulent accounts with U.S. financial institutions to disguise illegal transactions. Using the cover of these sham entities, the Full Tilt Enterprise processed illegal transactions through the Federal Reserve's Automated Clearinghouse ("ACH") system and also tricked U.S. banks and financial institutions into extending credit for transactions that otherwise would never have been approved.

7.     U.S. customers who played for real-money on the Full Tilt website were required to maintain a Player Account with Full Tilt. U.S. customers deposited their funds into their personal "secure" Player Accounts through a number of methods, including credit and debit card transactions and wire transfers ("eChecks" through ACH). The deposited funds were held by Full Tilt, in bailment or escrow, in accounts that were accessible to the players at all times through their Full Tilt Player Accounts until April 15, 2011. The funds remained, at all times, the property of the U.S. account holders who deposited them, even though Full Tilt served as a custodian. Upon establishing their Player Accounts and depositing a minimum sum into their

Player Accounts, U.S. customers were free to play for real-money in Full Tilt Poker card rooms with players from all over the world and even with professional poker legends sponsored by Full Tilt.

8.      Team Full Tilt is composed of elite professional players, sponsored by Full Tilt, who play for and promote the brand in high-stakes events like the internationally televised World Series of Poker.  Team members also directly interact with U.S. internet poker players through the Full Tilt website, wear company gear with the Full Tilt insignia during all professional events, and make public statements to publicize their affiliation with Full Tilt.  Perhaps most importantly, all members of the Team own an equity interest in—and are directors of—the Full Tilt and/or the entities that operate under the Full Tilt name.

9.      Unbeknownst to U.S. players, the funds that they deposited in their individual player accounts were fraudulently processed by the Full Tilt Enterprise.  Due, in part, to the passage of the 2006 Unlawful Internet Gambling Enforcement Act (18 U.S.C.S. § 5361 *et. seq.*), the Enterprise was unable to process eCheck and credit card transactions from U.S. Players.  These restrictions drove the Enterprise to engage in the illegal acts described above and, more thoroughly, herein.

10.     Rather than abiding the restrictions and requiring U.S. player deposits to be in the form of cash transfers, or concentrating its businesses in overseas markets the way that other internet poker companies had, the Enterprise schemed to commit fraud and money laundering, for fear of losing its prominent stake in the highly profitable U.S. internet poker market.  Through the Enterprise, the Defendants conducted Full Tilt's U.S. internet poker business by processing U.S. player funds pursuant to, and through, illegal wire and bank fraud schemes.

11.     Now, U.S. players are wrongfully denied access to approximately $150 million (USD) in funds they deposited in their own Player Accounts.  After deceitfully separating U.S. players from their money, Full Tilt Poker refuses to refund the U.S. players' deposits, to reimburse U.S. players for the dollar-value of the contents of their Player Accounts, or to permit U.S. players access to their Player Accounts.

12.     Full Tilt has effectively conceded its obligation to restore access to U.S. Player Accounts, stating: "Please be assured that your funds are safe, and we thank you for your patience while we do everything in our power to have your money returned to you as soon as possible."  Full Tilt's statements are of little comfort to U.S. players who, in some cases, have hundreds of thousands of dollars tied up in their inaccessible Full Tilt Player Accounts.

## JURISDICTION AND VENUE

13.     Subject Matter Jurisdiction.  This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C.S § 1331 because Plaintiffs allege violation of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO Act" or the "Act"), 18 U.S.C. § 1961 et. seq.  This Court has supplemental jurisdiction over Count I pursuant to 28 USC § 1367.

14.     Diversity Jurisdiction.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.S. § 1332.  The named plaintiffs are residents and citizens of New York, Minnesota and New Jersey.  No Defendant resides in or is a citizen of New York, Minnesota or New Jersey.  The amount in controversy in this matter exceeds $100 million.

15.     Personal Jurisdiction.  This Court has personal jurisdiction over the Defendants because the Act provides for nation-wide service of process.  18 U.S.C. 1965(b).  In addition, this Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k)(l)(A),

because all Defendants, through their conduct and participation with the Enterprise, have done significant and continuous business in the State of New York.

16.     Many U.S. player account holders, including Plaintiff Segal, are residents of the State of New York and deposited funds in their Full Tilt Poker player account in New York, engaging with the Full Tilt Poker Enterprise in New York through their transactions and on a regular basis through the Full Tilt Poker web portal. These players sustained their injuries in New York, where they are currently unable to access their own funds.

17.     Venue. 18 U.S.C.S. 1965(b) authorizes venue in this District. In addition, venue is proper in this District because there is no other district in which every defendant can be found, and because there is no single identifiable district in which a substantial part of the relevant events can be said to have 'occurred' or where a substantial part of the property that gave rise to the action is physically located.

## PARTIES

**Plaintiffs**

18.     Named Plaintiffs bring this Action on behalf of a putative class of all U.S. residents who, on April 15, 2011, held real-money Full Tilt Poker Player Accounts.

19.     **Plaintiff Steve Segal** is an individual residing in New York. Segal has, at relevant times, including April 15, 2011, maintained a Player Account with Full Tilt that was accessible using the Full Tilt software via connection to the Full Tilt server(s). Between 2006 and 2011, Segal downloaded the Full Tilt software, entered into an agreement with Full Tilt, and proceeded to play internet poker in Full Tilt card rooms. Segal engaged in numerous transactions with Full Tilt through his Player Account, including deposits and withdrawals

through eCheck.  On April 15, 2011, Segal had a Full Tilt Player Account balance.  Since that day, Segal has been denied access to his account and to the funds and assets therein.

20.     **Plaintiff Nick Hammer** ("Hammer") is an individual residing in Minnesota. Hammer has, at relevant times, including April 15, 2011, maintained a Player Account with Full Tilt that was accessible using the Full Tilt software via connection to the Full Tilt server(s). Between 2006 and 2011, Hammer downloaded the Full Tilt software, entered into an agreement with Full Tilt, and proceeded to play internet poker in Full Tilt card rooms.  On April 15, 2011, Hammer had a Full Tilt Player Account balance.  Since that day, Hammer has been denied access to his account and to the funds and assets therein.

21.     **Plaintiff Robin Hougdahl** ("Hougdahl") is an individual residing in Minnesota. Hougdahl has, at relevant times, including April 15, 2011, maintained a Player Account with Full Tilt that was accessible using the Full Tilt software via connection to the Full Tilt server(s). Between 2006 and 2011, Hougdahl downloaded the Full Tilt software, entered into an agreement with Full Tilt, and proceeded to play internet poker in Full Tilt card rooms.  On April 15, 2011, Hougdahl had a Full Tilt Player Account balance.  Since that day, Houdahl has been denied access to his account and to the funds and assets therein.

22.     **Plaintiff Todd Terry** ("Terry") is an individual residing in New Jersey.  Terry has, at relevant times, including April 15, 2011, maintained a Player Account with Full Tilt that was accessible using the Full Tilt software via connection to the Full Tilt server(s).  Between 2006 and 2011, Terry downloaded the Full Tilt software, entered into an agreement with Full Tilt, and proceeded to play internet poker in Full Tilt card rooms.  On April 15, 2011, Terry had a Full Tilt Player Account balance.  Since that day, Terry has been denied access to his account and to the funds and assets therein.

8

**Defendants**

23.    **Defendant Raymond Bitar** ("Bitar") is an individual residing in the State of California and a member of the Enterprise.  Bitar is—and at all or some relevant time(s) was—a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Bitar is and/or was CEO of Tiltware LLC since its founding in 2003 and Bitar is one of only two directors of Tiltware LLC.  A warrant for Bitar's arrest, in connection with the Department of Justice's ongoing prosecution of racketeering activity by individuals associated with Full Tilt, was issued on or about April 15, 2011.  Since that date, Bitar, a U.S. resident, has not returned to the United States.  Bitar, with Burtnick, are RICO Defendants

24.    **Defendant Nelson Burtnick** ("Burtnick") is an individual residing in Ireland, and is and/or was, starting in 2009, an employee of Full Tilt Poker Ltd. and the head of the payment processing department for Full Tilt (and/or its Member Companies).  Burtnick has directed or otherwise participated in the conduct of the Enterprise's affairs, especially with respect to payment processing activity.  A warrant for Burtnick's arrest, in connection with the Department of Justice's ongoing prosecution of racketeering activity by individuals associated with Full Tilt, was issued on or about April 15, 2011.  Since that date, Burtnick has not entered the United States.

25.    **Defendant Full Tilt Poker Ltd.** is the corporate person with which the members of the Full Tilt Team have contracted.  Full Tilt Poker Ltd. is a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.

26.    **Defendant Tiltware LLC** ("Tiltware") is a corporate person and the exclusive poker software developer and licensor for Full Tilt.  Tiltware is also the Full Tilt marketing wing, and is headquartered and registered at all relevant time(s) in California.  Tiltware is a member of

9

the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts. Tiltware is the parent company of Pocket Kings Ltd., Pocket Kings Consulting Ltd., Filco Ltd., and other Full Tilt Companies.

27.   **Defendant Vantage, Ltd.** ("Vantage"), is a corporate person registered in Alderney, in the Channel Islands, with which users of the Full Tilt website, including, specifically, "persons situated in North America," enter into an "End User License Agreement." That Agreement states: "Adult users of all skill levels who are situated in North America can download the proprietary gaming software needed to participate in poker tournaments and to play online interactive games of poker for real money at www.FullTiltPoker.com." Full Tilt funds--including the proceeds (or equivalent) of the Enterprise's illegal activities—sit in a Swiss bank in under the Vantage name. Vantage is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts. Vantage, operating under the Full Tilt Poker brand name, is also a licensee of the Alderney Gambling Control Commission; By virtue of its license, Vantage is licensed, on behalf of Full Tilt, to register new customers, accept deposits from new and existing customers, permit withdrawal of funds by existing customers and permit participation by customers in gambling transactions and game play.

28.   **Defendant Filco Ltd.** ("Filco"), is a corporate person that holds or held, at all or some relevant time(s), the "eGambling" license issued by the Alderney Gambling Control Commission. Filco is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts. Filco is explicitly named in Pocket Kings Ltd. documents as a related company to Pocket Kings Ltd., among others, and Filco's corporate parent is Tiltware. As a licensee of the Alderney Gambling Control Commission, Filco is

licensed, on behalf of Full Tilt Poker, to register new customers, accept deposits from new and existing customers, permit withdrawal of funds by existing customers and permit participation by customers in gambling transactions and game play.

29.   **Defendant Kolyma Corporation A.V.V.** ("Kolyma") is a corporate person and an Aruban financial services limited liability company. Kolyma, by virtue of its formation as an "A.V.V." company, is eligible for certain exemptions from profit and dividend withholding tax. Kolyma is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts. Kolyma is the legal owner of the Full Tilt website.

30.   **Defendant Pocket Kings Ltd.** ("Pocket Kings"), is a corporate person, headquartered in Ireland, and is responsible for "operating" the Full Tilt website. Pocket Kings has at all or some relevant time(s) provided "[t]echnology and [m]arketing consulting services to the online poker industry and one of the fastest growing poker sites, Full Tilt Poker." Pocket Kings is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts. Pocket Kings' parent company is Tiltware. Pocket Kings is a "related company" to, *inter alia*, Filco Ltd., Pocket Kings Consulting Ltd., and a BVI incorporated company called My West Nook Limited.

31.   **Defendant Pocket Kings Consulting Ltd.** ("Pocket Kings Consulting"), is a corporate person headquartered in Ireland. Pocket Kings Consulting is a related company to Pocket Kings, Filco, and My West Nook Limited. Pocket Kings Consulting is the exclusive consultant to Full Tilt Poker.

32.   **Defendant Ranston Ltd.** ("Ranston") is a corporate person in whose name Full Tilt Poker funds are held in Switzerland. Ranston is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts.

33.     **Defendant Mail Media Ltd**, ("Mail Media") is a corporate person in whose name Full Tilt funds are held in Switzerland. Mail Media is a member of the Enterprise and has participated in and/or directed the conduct of the Enterprise in aid of its illegal acts.

34.     **Defendant John Does, 1-100** ("John Doe(s)") are entities and/or persons associated with Full Tilt and/or Full Tilt Companies. The identities of these defendants are currently unknown to Plaintiffs. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

35.     Together, Bitar, Burtnick, Full Tilt Poker Ltd., Tiltware, Vantage, Filco, Kolyma, Pocket Kings, Pocket Kings Consulting, Ranston, Mail Media and John Does are the "RICO Defendants."

36.     **Defendant Howard Lederer** ("Lederer") is an individual residing in the State of Nevada, and a member of the Enterprise. He is and was, at relevant times, a shareholder and director of, and/or a participant in, one or more entities operating under the Full Tilt umbrella "Full Tilt Companies"). Lederer, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch. Lederer is also a founder and creator of the Full Tilt Poker site and brand, and is and/or was President of Tiltware LLC, the software developer and licensor of the proprietary Full Tilt Poker software.

37.     **Defendant Phillip Ivey Jr.** ("Ivey"), is an individual residing in the State of Nevada and a member of the Enterprise. Ivey, is—and at all relevant times was—a shareholder and director of, and/or a participant in, Full Tilt and/or one or more Full Tilt Companies. Ivey is a founder of the Full Tilt Poker site and brand and, a professional poker player himself, is a member of Team Full Tilt. As a member of the Team, Ivey represents the Full Tilt brand in

poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.    Ivey is said to hold at least a 5% stake in the Full Tilt venture.

38.    **Defendant Christopher Ferguson** ("Ferguson") is an individual residing in the State of California and a member of the Enterprise.  Ferguson is and has been, at all or some relevant time(s), a shareholder and director of, and/or a participant in, Full Tilt and/or one or more Full Tilt Companies.  Ferguson is a founder of the Full Tilt site and brand and, a professional poker player himself, is a member of Team Full Tilt.  As a member of the Team, Ferguson represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

39.    **Defendant Johnson Juanda** ("Juanda") is an individual residing in the State of California, and is a member of the Enterprise.  At all or some relevant time(s), Juanda has been a shareholder and director of, and/or a participant in, Full Tilt and/or one or more Full Tilt Companies.  Juanda, a professional poker player himself, is a member of Team Full Tilt.  As a member of the Team, Juanda represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

40.    **Defendant Jennifer Harman-Traniello** ("Harman") is an individual residing in the State of Nevada and is a member of the Enterprise.  At all or some relevant time(s), Harman has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Harman, a professional poker player herself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

41.     **Defendant Phillip Gordon** ("Gordon") is an individual residing in the State of Washington, and is a member of the Enterprise.  At all or some relevant time(s), Gordon has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Gordon, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

42.     **Defendant Erick Lindgren** ("Lindgren") is an individual residing in the State of Nevada and is a member of the Full Tilt Enterprise.  At all or some relevant time(s), Lindgren has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Lindgren, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

43.     **Defendant Erik Seidel** ("Seidel") is an individual residing in the State of Nevada, and is a member of the Enterprise.  At all or some relevant time(s), Seidel has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Seidel, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

44.     **Defendant Andrew Bloch** ("Bloch") is an individual residing in the State of Nevada, and is a member of the Enterprise.  At all or some relevant time(s), Bloch has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Bloch, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt

brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

45.     **Defendant Mike Matusow** ("Matusow") is an individual residing in the State of Nevada, and is a member of the Enterprise.  At all or some relevant time(s), Matusow has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Matusow, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

46.     **Defendant Gus Hansen** ("Hansen") is an individual residing in the Kingdom of Denmark, and is a member of the Enterprise.  At all or some relevant time(s), Hansen has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Hansen, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

47.     **Defendant Allen Cunningham** ("Cunningham") is an individual residing in the State of California, and is a member of the Enterprise.  At all or some relevant time(s), Cunningham has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Cunningham, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

48.     **Defendant Patrik Antonius** ("Antonius") is an individual residing in the Republic of Finland and is a member of the Enterprise.  At all or some relevant time(s), Antonius has been a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.

Antonius, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.

49.    Plaintiffs expect that after appropriate discovery is conducted, Lederer, Ivey, Ferguson, Juanda, Harman, Gordon, Lindgren, Seidel, Bloch, Matusow, Hansen, Cunningham, and Antonius may also be named as RICO Defendants.  These individuals, together with the RICO Defendants, are the "Defendants."

## CLASS ACTION ALLEGATIONS

50.    Plaintiffs bring this action as a class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (b)(3), on behalf of themselves and all others similarly situated (the "Class").

51.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

a.    ***Numerosity***.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands—possibly millions—of US poker players who held accounts with Full Tilt on April 15th, 2011.

b.    ***Commonality***.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

i.      whether the Defendants are "persons" for purposes of the RICO statute, that were employed by or associated with an interstate enterprise;

ii.     whether an enterprise affecting interstate commerce existed;

iii.    whether Defendants were each employed by or associated with the enterprise;

iv.     whether Defendants participated in the conduct or affairs of the enterprise;

v.      whether Defendants participated through a pattern of racketeering activity;

vi.     whether Defendants held interest in, or control of, the alleged enterprise;

vii.    whether Defendants conspired to commit or committed bank fraud, in violation of 18 USC §1344;

viii.   whether Defendants conspired to commit or committed wire fraud, in violation of 18 USC §1343;

ix.     whether Defendants' alleged actions constitute a pattern of racketeering activities;

x.      Whether injuries to Plaintiffs' business or property were sustained by reason of the Defendants' activities in violation of 18 USC §1962.

c.    **_Typicality._**  Plaintiffs' claims are typical of the claims of the members of the Class because all U.S. holders of Full Tilt accounts have been wrongfully denied access to the personal or business property held in those accounts.

d.    **_Adequacy_**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions, complex, and RICO litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

52.    Class action status in this civil RICO Action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

53.    Class action status is also warranted under the first and third subsections of Rule 23(b) because prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for defendants, and questions of law or fact common to members of the Class predominate over any questions affectingly only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FACTUAL ALLEGATIONS

### A.    The Full Tilt Umbrella and the Full Tilt Enterprise

54.    Full Tilt is an umbrella undertaking and brand name under which a number of privately held companies and other ventures, the "Full Tilt Companies," do business in the United States and internationally.  The RICO Defendants, with the Full Tilt Companies, formed

an informal Enterprise which operated under the Full Tilt brand name. Working through the Enterprise, the RICO Defendants conspired to—and did—illegally acquire and channel U.S. player funds.

55.     Full Tilt's primary face to U.S. real-money poker players has been the Full Tilt Poker internet gambling venture, which includes the online card rooms accessed through the Full Tilt software, which is downloaded from Full Tilt's "real-money" gambling website, "fulltiltpoker.com." The Full Tilt Poker internet gambling venture is a product that was launched, directed, and managed, in part, by members of the Enterprise working in concert.

56.     There were companies and individuals, operating under the Full Tilt brand and as agents or representatives of Full Tilt, who executed perfectly legal activities under the Full Tilt name. For example, the development of the Full Tilt poker software developed by Tiltware is not alleged to be illegal in itself. Full Tilt also maintained an aggressive marketing team that promoted Full Tilt in a manner that is not, in itself, problematic: Full Tilt sponsored certain high-stakes legal gambling events around the world; sponsored the Full Tilt Team; partnered with ESPN to televise certain high-stakes legal gambling events; produced advertisements for Full Tilt's "play-money" site (www.fulltiltpoker.net) that aired on cable television (including the Game Show Network) and were posted on the internet. Full Tilt Team members played high stakes poker games as representatives of Full Tilt, wearing the Full Tilt insignia. These advertisements were specifically directed to U.S. poker players. When Full Tilt's marketing efforts were successful, they induced U.S. players to navigate to Full Tilt's website and open an account there. Full Tilt deliberately established contacts with U.S. players in New York and derived revenue from U.S. players in New York because it intended to keep or grow its stake in the U.S. internet poker market.

57.    Full Tilt's direct commercial contacts with U.S. players in New York includes:

- soliciting players through internet advertisements and links;

- buying advertisements on television programs that are readily accessible to residents of New York;

- sponsoring high-stakes games (and ESPN poker programming) televised to residents of New York;

- obtaining contact and personal information, including bank account information, from U.S. players in New York through the internet;

- entering into a contract with internet poker players from New York regarding the Full Tilt software that U.S. real money and play-money players downloaded;

- maintaining player accounts for all U.S. players, including players in New York, and providing access to those accounts through the internet;

- sponsoring poker celebrities, including the Individual Defendants, to play (in person) for the Full Tilt brand and wear Full Tilt patches in televised games shown in New York.

58.    There were a number of companies and individuals working within the Full Tilt outfit—all agents, representatives, directors, owners, officers and/or principals of the Full Tilt outfit—that were joined together for the purpose of obtaining and processing U.S. players' funds. The entities in the Enterprise shared the common purposes of maintaining Full Tilt's position in the U.S. market by enabling and participating in transactions with U.S. players.  The RICO Defendants commandeered the Enterprise and steered it to illegally and deceitfully accepting and processing deposits from U.S. players.

59.    The RICO Defendants achieved the Enterprise's purposes through wire fraud, bank fraud and money laundering offenses.   Full Tilt was a beneficiary of the Enterprise's activities, but not all entities associated with Full Tilt were members of the Enterprise and not all members of the Enterprise conducted or participated in the illegal activity of the RICO Defendants.

60.    Full Tilt Companies that formed the Enterprise include, but are not limited to, the following groups:

a.    The Full Tilt Team of professional poker players who own and, in part, direct, the Full Tilt Enterprise;

b.    Tiltware,  the exclusive poker software developer and licensor for the Enterprise, and the Enterprise's marketing wing, headquartered and registered, at all or some relevant time(s) in California;

c.    Vantage, the corporate entity registered in Alderney, in the Channel Islands, with which users of the Full Tilt Poker website, including, specifically, "persons situated in North America," enter into an "End User License Agreement."  That Agreement states: "Adult users of all skill levels who are situated in North America can download the proprietary gaming software needed to participate in poker tournaments and to play online interactive games of poker for real money at www.FullTiltPoker.com."   Funds are also held, in a Swiss bank in Vantage.'s name;

d.    Filco, the corporate entity that holds or held, at all or some relevant time(s), the "eGambling" license issued by the Alderney Gambling Control Commission;

e.    Kolyma, the Aruban financial services limited liability company that is eligible for exemptions from profit and dividend withholding tax, subject to limitations;

          f.      Pocket Kings, the Irish company which "operates" the Full Tilt Poker site. Pocket Kings has, at all or some relevant time(s) provided "[t]echnology and [m]arketing consulting services to the online poker industry and one of the fastest growing poker sites, Full Tilt Poker";

          g.      Pocket Kings Consulting;

          h.      Ranston, the entity in whose name certain Full Tilt funds are held in Switzerland;

          i.      Mail Media, the entity in whose name certain Full Tilt funds are held in Switzerland;

          j.      Full Tilt Poker Ltd., an apparent alternate name or entity associated with the Enterprise.

61.      Each of the above-named entities is or was a member of the Full Tilt Enterprise at a time or times relevant to this Complaint. The specific interconnections among components of these entities are fully known only to Defendants and can only be—and will be—further clarified through appropriate discovery.

62.      RICO Defendants, all members of the Full Tilt Enterprise, conspired to commit, and did commit, wire fraud, bank fraud, money laundering and other federal and state offenses for the benefit and under the name and interests of the Full Tilt undertaking.

63.      Profits from the Full Tilt Poker website, player deposits, licensing fees, agreements, merchandise sales, and other Full Tilt Poker ventures, were distributed amongst the Defendants and the Full Tilt Companies, in a manner that can only—and will—be clarified with appropriate discovery.

64.     U.S. residents, during all relevant times, have been targeted by the Full Tilt marketing campaigns, have navigated to the Full Tilt website, have opened accounts, deposited their own funds into those accounts, and played "real-money" poker using the Full Tilt Poker product.

**B.     Full Tilt U.S. Player Accounts**

65.     U.S. internet poker players were known to keep significant portions of their personal wealth in accounts with the Big Three.  On the Full Tilt website, U.S. players were informed of the four methods by which they could deposit funds into a Full Tilt Player Account:

- **Instant eChecks**.  U.S. players could use the Automated Clearinghouse system ("ACH"), an electronic network administered by the Federal Reserve, to transfer funds between U.S. bank accounts and a Full Tilt account using "eChecks";

- **Visa and MasterCard**.  U.S. players could use their ATM, credit, debit or check cards to transfer funds into their accounts;

- **Click2Pay**.  U.S. players could transfer funds from their German, Swiss or Austrian bank accounts (or credit/debit cards) to a Full Tilt account directly;

- **Cash Transfer**.  Full Tilt advertised that U.S. players could "walk into more than 100,000 convenient locations (such as banks, convenience stores, and markets), and transfer cash in person."

66.     When players wished to 'cashout' or withdraw the funds in their account, they did so with ease, in most cases by navigating to a prominent button on the player's screen entitled "cashier," selecting a withdrawal amount, and selecting a method of withdrawal; withdrawal options included ACH and credit card.  Withdrawal by one of those methods resulted in credit to the withdrawing player's bank account (either automated credit or by wire transfer).

### C.      Full Tilt Enterprises' Frauds: The Predicate Acts

67.      The passage of the UIGEA in 2006 made it a federal crime for a business to knowingly accept most forms of payment "in connection with the participation of another person in unlawful Internet gambling."   Upon the UIGEA's passage, many internet poker businesses terminated their U.S. operations.  Full Tilt did not.

68.      Due in part to the passage of the UIGEA and in part to rising concerns over the past decade surrounding the legality of internet gambling in the United States, U.S. banks have increasingly prohibited such companies from opening bank accounts for the purpose of engaging in internet gambling related transactions with U.S. customers.  Without U.S. accounts to receive credit card and eCheck transfers from U.S. gamblers, the Full Tilt Enterprise was rendered nearly incapable of profiting in its most valuable geographic market.

69.      Unbeknownst to U.S. players holding Full Tilt Player Accounts, the RICO Defendants began to work together to evade these restrictions.  Together, the RICO Defendants executed a massive fraud scheme that involved intentionally creating sham merchants and fake e-commerce web sites, lying to U.S. players, deceiving U.S. banks and financial institutions, and making off with millions of dollars in illicit profits.

70.      RICO Defendants came up with two "solutions" to their processing problems.  Both were intentional efforts to separate U.S. players from their funds through an unremitting series of lies and omissions about the true nature of the transactions Full Tilt was pitching.  Specifically, the Enterprise directly lied to U.S. players about:

- the risks they faced by depositing their funds in Full Tilt;

- the way their funds would be handled upon deposit;

- Full Tilt's relationship with so called "third party" independent processors;

- Full Tilt's creation and use of sham companies and fake e-commerce websites to deceive banks into facilitating the player's transaction with Full Tilt;

- Full Tilt's non-compliance with bank regulations;

- the opening and use of offshore bank accounts in the name of fake merchants and e-commerce businesses; and

- the opening and use of U.S. bank accounts under equally false pretenses.

71.    RICO Defendants went to these lengths for a reason. The U.S. internet poker industry is estimated to be worth as much as $6 billion. Poker players play against each other, not the house, and Full Tilt takes a cut out of every pot. The more people play, the more pots there are, and the more money Full Tilt makes.

72.    But to continue reaping these funds, and for the Full Tilt Enterprise to successfully obtain and process U.S. player funds, the Enterprise had to continue engaging in transactions with players without tipping off the banks that their accounts were being used for illegal or restricted transactions.

### 1.    The Fraudulent Credit Card Transactions

73.    The Government Accountability Office ("GAO") issued a report in 2002 on Internet Gambling. The GAO report explains that:

> Full-service companies and credit card associations have taken different approaches to restricting the use of their cards for Internet gambling. Credit card companies have focused primarily on prohibiting Internet gambling sites from becoming credit card merchants. Credit card associations and their members have focused primarily on facilitating the blocking of Internet gambling transactions. Most large U.S. association members that issue credit cards told us that they have chosen to block these transactions.

GAO Report, Internet Gambling 20 (Dec. 2002).

74.     Starting in or about 2001, Visa and MasterCard began requiring that internet gambling merchants which accept VISA or MasterCard payments apply a particular transaction code to internet gambling transactions. These codes follow the transaction through the credit card networks to the card issuer. The code information enables the issuer to identify the internet gambling transactions and to choose to approve or deny the transaction.

75.     By 2002, U.S. banks that issued credit cards to U.S. consumers were becoming increasingly reluctant to extend credit to customers for internet gambling purposes and began declining transactions bearing the internet gambling code as a matter of policy. The GAO report stated, in relevant part:

> Officials from the eight large U.S.-based issuing member banks we reviewed, which represent more than 80 percent of the purchase volume of cards issued by VISA and MasterCard in the United States, all indicated that they had implemented policies to deny payment authorization for Internet gambling transactions coming through their automated systems. Officials of a trade association for community banks and the processor of its members' credit card transactions stated that most, if not all, of the small community bank issuers had also chosen to block Internet gambling transactions.

GAO Report, 24 (Dec. 2002).

76.     As U.S. banks stopped authorizing Full Tilt's credit card transactions, the Full Tilt Enterprise found itself incapable of legally processing these transactions with players belonging to Full Tilt's most profitable geographic market.

77.     One approach undertaken by the Full Tilt Enterprise was to direct and pay third party payment processors to lie to U.S. banks about the nature of the internet gambling transactions. As alleged more fully in the DOJ Criminal Indictment of, inter alia, Raymond Bitar and Nelson Burtnick, see Ex. B, members of the Enterprise, working with other alleged co-conspirators, directed third party processors to apply incorrect codes (or no codes at all) to the

transactions at issue in order to fool U.S. banks into believing that the transactions were unrelated to any internet gambling scheme.

78.    In addition, the Enterprise directed that fake companies be 'established' and that these shell companies open Visa and MasterCard merchant processing accounts that would not be easily associated with the Full Tilt poker operation.   This was necessary to the scheme because the credit card networks were known to investigate the holders of merchant accounts to ensure that merchant accounts were not being used for illegal or otherwise banned activity.   The GAO Report brought some attention to this ruse when it reported, back in 2002,  that an official at one issuing bank, said that the bank's "system had identified eight merchants that were conducting inappropriate activities, including disguising Internet gambling transactions," in the previous quarter.  GAO Report, 24.

79.    The Full Tilt RICO Defendants found a number of poker processors through which, for a price, the Enterprise could process credit card transactions without being easily identified.   These processors, using fake names like "Arrow Checks," "TLC Global," and "Eastern Expressions," opened merchant accounts with Visa and MasterCard merchant banks under the phony pretense that the transactions they processed—which bore no gambling coding—were for legitimate merchandise.  By using the phony companies to initiate credit card charges through their merchant bank accounts, and by ensuring that these charges did not bear the appropriate gambling code, the Enterprise's credit card charges were difficult to identify as "gambling-related" and issuing banks were tricked into approving transactions that they would otherwise deny outright.

80.     The Enterprise engaged in thousands upon thousands of such transactions during the Class Period, including those listed at ¶ 103.  Each such transaction constitutes a wire fraud and a predicate act.

### 2.     The Fraudulent E-Check Scheme

81.     Further impeding Full Tilt's efforts to engage U.S. customers in internet poker was the fact that the UIGEA rendered another popular deposit and withdrawal method, eChecks, unavailable to the Full Tilt Enterprise.  As Full Tilt was consistently denied a U.S. bank account—particularly after the passage of the UIGEA—Full Tilt was also ineligible to use the ACH system.

82.     EChecks are electronic fund transfers to and from U.S. bank accounts.  Echecks are processed through the Automated Clearinghouse system, an electronic network administered by the Federal Reserve.  Full Tilt Companies, including the Corporate Defendants, were prevented from opening U.S. bank accounts in their own names to process player funds due to legal restrictions, but the ACH system was only available for transactions to and from U.S. bank accounts.

83.     To enable eCheck processing, the Enterprise used middle-men to find third party payment processors to deceitfully handle the internet gambling transactions.  In fact, Defendant Bitar is known to have entered into at least one processing agreement with one or more eCheck processor.  The Full Tilt Enterprise, at the direction of Bitar and other RICO Defendants, paid these e-processors to hide from U.S. banks their receipt of gambling payments.

84.     To accomplish this fraud, the eCheck processors opened bank accounts at U.S. based banks, explicitly or implicitly deceiving the U.S. banks as to the nature of the accounts and the transactions it processed.  The eCheck processors are known to have lied about the transactions with U.S. banks, falsely giving the banks the impression that the accounts would be

used to process eChecks for a variety of e-commerce merchants and not for any particular gambling related purpose.

85. The Enterprise then conspired with the e-check processors to create phony companies, sometimes evidenced by fake e-commerce websites, which would originate and/or receive the e-check transactions to or from U.S. players. As a result, U.S. banks were fooled into believing that the transactions processed by these accounts were related to legitimate business activity undertaken by a legitimate company. A U.S. bank digging for more information about the e-check processor would find phony evidence of a real company in the form of an e-commerce website. In reality, these fake companies and their websites were all part of an elaborate ruse to enable the Full Tilt Enterprise to accept and process funds from U.S. players who wished to deposit money in their individual Full Tilt Poker accounts via eCheck.

86. The Enterprise engaged in thousands upon thousands of such transactions during the Class Period, including those listed at ¶ 103. Each such transaction constitutes a wire fraud and a predicate act.

### 3. Misrepresentation Directed At Plaintiffs And Sent Through Interstate Commerce

87. Full Tilt Poker's website deceptively represented to account holders that the account holders' money would be "safe and secure" upon deposit in a Full Tilt Player Account. Specifically, one webpage stated:

> If you're looking to get the most out of your online poker experience, Full Tilt Poker offers a wide selection of real money ring games and tournaments for your enjoyment. What's more, **Full Tilt Poker works hard to ensure that playing for real money is easy, safe and secure by**:
>
> - **Providing a variety of safe and secure <u>payment processors</u>** [indicating link] to make depositing money fast and easy.

- **Ensuring any money you have on deposit with Full Tilt Poker is completely <u>safe and secure</u>** [indicating link].

- Protecting your <u>valuable personal information</u> [indicating link].

- **Processing <u>withdrawals</u>** [indicating link] **quickly and efficiently.**

(Emphasis added.)

88.     This description of Full Tilt's payment processing operations is simply false.  In reality, the payment processors were not safe and secure because they were sham companies; the funds held in player accounts ("on deposit") with Full Tilt Poker were never safe and secure because they were the object of the Enterprise's money laundering scheme; and, withdrawal processing has been unavailable to U.S. players for nearly ten weeks.

89.     Full Tilt's payment processors set up sham companies at the direction of the Enterprise for the sole purpose of:

- circumventing legal and institutional restrictions;

- originating U.S. bank accounts under false pretenses to process player funds through the ACH system, subjecting those funds to extreme risk;

- deceiving U.S. financial institutions about the nature of the credit card transactions to be processed; and,

- ultimately channeling those illegally processed funds to Full Tilt Player Accounts—accounts that, as a practical matter, would not exist absent the frauds and misrepresentations described.

90.     In a further act of brazen misrepresentation, one Full Tilt Poker webpage dealing with "Security" stated:

> Full Tilt Poker conducts their banking and financial affairs in accordance with generally accepted standards of internationally recognized banking institutions.  Full Tilt Poker follows and

adheres to applicable laws pertaining to transaction reporting and
anti-money laundering laws and regulations.

91.     These material misrepresentations falsely proclaimed to players that Full Tilt
could be trusted with their funds.   Through these statements, the Enterprise successfully
concealed the truth from players about the extreme risks any player depositing money in a Full
Tilt account actually bore.

92.     The Enterprise deceived Plaintiffs by explicitly misrepresenting, on the Full Tilt
website:

- the risks players faced by depositing their funds in Full Tilt;

- the way player funds would be handled upon deposit;

- Full Tilt's relationship with the third party processors;

- the creation and use of sham companies and fake e-commerce websites to deceive
  banks into facilitating players' transactions with Full Tilt;

- Full Tilt's non-compliance with bank regulations;

- the opening and use of offshore bank accounts in the name of fake merchants and
  e-commerce businesses; and,

- the opening and use of U.S. bank accounts under equally false pretenses.

**D.     The Predicate Acts of Wire Fraud, Bank Fraud and Money Laundering
         Directly Harmed Plaintiffs**

93.     The Enterprise, aware that the two most popular methods of processing player
deposits and fees were no longer legally available to Full Tilt, contrived to find another way to
preserve the flow of money it made off of U.S. customers playing real-money poker in Full Tilt's
internet card rooms.   Both "work-arounds" implemented by RICO Defendants were plainly
illegal.

94.     Both the fraud involving eChecks (paragraphs 81 through 86 above) and the fraud involving credit cards (paragraphs 73 through 80 above), were intentionally executed with the purpose of furthering the Enterprise's scheme.  Plaintiffs were directly injured because they were deceived into depositing their funds.  Absent the work-arounds devised by the Enterprise, Plaintiffs would never—and as a practical matter, could never—have deposited their funds in Full Tilt and would not now be deprived of those funds.

95.     RICO Defendants went to these lengths for a reason. The U.S. internet poker industry is estimated to be worth as much as $6 billion.  Poker players play against each other, not the house, and Full Tilt takes a cut out of every pot.  The more people play, the more pots there are, and the more money Full Tilt makes.

96.     But to continue reaping these funds, Full Tilt had to continue engaging in transactions with players without tipping off the banks that their accounts were being used for illegal or restricted transactions.  This required the Enterprise to disguise their acceptance and processing of funds from U.S. players and manipulate and deceive U.S. banks, directly resulting in the criminal investigation and indictment of persons associated with the Full Tilt Enterprise, the seizure of the Enterprise's assets.  When this occurred, the Full Tilt Enterprise terminated access to player accounts, retaining possession of the funds.

*The Department of Justice's Criminal Indictment and Civil Action*

97.     On April 15, 2011, the card rooms operated by the Big Three were shut down by the Department of Justice.   Individuals associated with the three enterprises, including founders of the three companies, were charged by the U.S. Attorney for the Southern District of New York in a criminal indictment which alleges wire fraud, bank fraud, money laundering and additional illegal acts.  Bitar is among the named criminal defendants in that action, and a

warrant has been issued for his arrest.  The three entities themselves are named defendants in a companion civil action, also filed by the US Attorney for the Southern District of New York, for money laundering, wire and bank fraud.  In connection with these pending actions, the Department of Justice has seized or sought the forfeiture of Full Tilt assets, including its domain name, several of its bank accounts, and profits.  The Department of Justice has not sought forfeiture of U.S. player funds and has expressly indicated that it expects each enterprise to return to U.S. customers the values of their Player Accounts.

98.     As explained in the DOJ Criminal Indictment, the Full Tilt Enterprise is alleged to have violated a number of federal statutes and to have participated in a number of frauds along with PokerStars and Absolute Poker:

> From at least in or about November 2006, and continuing through in or about April 2011, the three leading internet poker companies doing business in the United States were PokerStars, Full Tilt Poker and Absolute Poker/Ultimate Bet (collectively the "Poker Companies"). Because United States banks were largely unwilling to process [their] payments . . . , the three Poker Companies used fraudulent methods to avoid these restrictions and to receive billions of dollars from United States residents who gambled through the Poker Companies.  The principals of the Poker Companies, including . . . Raymond Bitar ("Bitar") and Nelson Burtnick ("Burtnick") of Full Tilt Poker; and others working in concert with the Poker Companies and on their behalf, deceived or directed others to deceive United States banks and financial institutions into processing billions of dollars in payments for the Poker Companies, by, among other things, arranging for the money received from United states gamblers to be disguised as payments to hundreds of non-existent online merchants and other non-gambling businesses.
>
> To accomplish this deceit, [Bitar and Burtnick, among others] . . . relied on highly compensated third party payment processors (the "Poker Processors") who lied to United States banks about the nature of the financial transactions they were processing and covered up those lies through the creation of phony corporations and websites to disguise payments to the Poker Companies. These Poker Processors included, among others, Ryan Lang ("Lang"), Bradley Franzen ("Franzen"), Ira Rubin ("Rubin"),

and Chad Elie ("Elie"), who, at various times relevant to this Complaint, processed and helped disguise payments to each of the three Poker Companies.

Working together, the Poker Companies and Poker Processors deceived United States banks and financial institutions - including banks insured by the Federal Deposit Insurance Corporation - into processing billions of dollars in gambling transactions for the Poker Companies. Approximately one-third or more of the funds deposited by gamblers went directly to the Poker Companies as revenue through the "rake" the Poker Companies charged players on almost every poker hand played online.

DOJ Civil Complaint, ¶¶ 1-4.

99.   Futhermore, the DOJ Civil Complaint explains that:

On or about March 21, 2011, the Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, issued a restraining order with respect to several of the Defendant Properties finding probable cause that these properties are subject to forfeiture pursuant to Title 18, United States Code, Sections 981 (a) (1) (C), 982 (a) (1), 982 (a) (2) (A), and· 1955 (d) and Title 28, United States Code, Section 2461(c).

Id., ¶ 9.

100.   The Civil money laundering action filed by the Department of Justice against Full Tilt Poker and others seeks in rem forfeiture of all right, title and interest in the assets of the Full Tilt Enterprise, including accounts used by payment processors for the Full Tilt Enterprise.

101.   The Department of Justice has criminally charged RICO Defendants Bitar and Burtnick, both associated with the Full Tilt Enterprise and the fraudulent activities described above, with, *inter alia*:

a.   Conspiracy to Violate the Unlawful Internet Gambling Enforcement Act

b.   Violation of the Unlawful Internet Gambling Enforcement Act

c.   Conspiracy to Commit Bank Fraud and Wire Fraud

d.   Conspiracy to Launder Money

102.    The RICO Defendants are equally responsible for the commission of these acts because they control the Enterprise through which these acts were committed, and/or because they are aiders and abettors and/or conspirators in the acts by virtue of their direction of and/or participation in the Enterprise.  Furthermore, each RICO Defendant participated in the scheme to defraud by accepting payments derived from the scheme.  Through their association, direction and participation in the conduct of the Enterprise's affairs, the RICO Defendants have reaped hundreds of millions of dollars in proceeds during the relevant time period.

103.    The following transactions, alleged in the DOJ Civil Complaint, were executed by the Enterprise with a confidential witness for the government who had a Player Account, with funds coming out of the witness's bank account in Manhattan:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/30/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | Visa | $ 100.00 | $ 100.00 |
| 4/09/10 | Visa | $ 30.00 | $ 30.00 |
| 4/23/10 | eCheck | $ 30.00 | $ 30.00 |
| 4/27/10 | eCheck | $ 20.00 | $ 20.00 |
| 4/28/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 30.00 | $ 30.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|---|---|---|---|
| 5/7/10 | eCheck | $ 11.00 | $ 11.00 |
| 5/11/10 | Visa | $ 12.00 | $ 12.00 |
| 5/12/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/12/10 | eCheck | $ 25.00 | $ 25.00 |
| 5/13/10 | Visa | $ 12.00 | $ 12.00 |
| 5/18/10 | eCheck | $ 18.00 | $ 18.00 |
| 5/26/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/2/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/2/10 | eCheck | $ 17.00 | $ 17.00 |
| 6/10/10 | eCheck | $ 20.00 | $ 20.00 |
| 6/11/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/14/10 | eCheck | $ 10.00 | $ 10.00 |
| 6/16/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/17/10 | eCheck | $ 50.00 | $ 50.00 |
| 6/24/10 | eCheck | $ 32.00 | $ 32.00 |
| 6/28/10 | eCheck | $ 28.00 | $ 28.00 |
| 6/29/10 | eCheck | $ 22.00 | $ 22.00 |
| 6/29/10 | eCheck | $ 34.00 | $ 34.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|---|---|---|---|
| 6/30/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/1/10 | eCheck | $ 47.00 | $ 47.00 |
| 7/2/10 | eCheck | $ 20.00 | $ 20.00 |
| 7/9/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/13/10 | eCheck | $ 10.00 | $ 10.00 |
| 7/13/10 | eCheck | $ 12.00 | $ 12.00 |
| 7/19/10 | eCheck | $ 14.00 | $ 14.00 |
| 7/23/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/26/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/26/10 | eCheck | $14.00 | $ 14.00 |
| 7/27/10 | eCheck | $ 21.00 | $ 21.00 |
| 7/28/10 | eCheck | $ 75.00 | $ 75.00 |
| 7/30/10 | Western Union | $ 105.00 | $ 105.00 |
| 8/3/10 | eCheck | $ 50.00 | $ 50.00 |
| 8/16/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/2/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/15/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/21/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/30/10 | eCheck | $ 11.00 | $ 11.00 |
| 10/14/10 | eCheck | $ 90.00 | $ 89.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 11/3/10 | eCheck | $ 45.00 | $ 45.00 |
| 11/15/10 | eCheck | $ 12.00 | $ 12.00 |
| 1/14/11 | ACH | $ 14.00 | Not Processed |
| 1/15/11 | ACH | $ 16.00 | Not Processed |
| 1/21/11 | ACH | $ 48.00 | Not Processed |
| 1/24/11 | ACH | $ 51.00 | Not Processed |
| 1/27/11 | ACH | $ 11.00 | Not Processed |
| 1/29/11 | ACH | $ 46.00 | Not Processed |
| 2/1/11 | ACH | $ 43.00 | Not Processed |
| 2/2/11 | ACH | $ 53.00 | Not Processed |
| 2/4/11 | ACH | $ 24.00 | Not Processed |
| 2/8/11 | ACH | $ 52.40 | Not Processed |
| 2/9/11 | ACH | $ 32.00 | Not Processed |
| 2/10/11 | ACH | $ 32.00 | Not Processed |
| 2/14/11 | ACH | $ 59.00 | Not Processed |
| 2/15/11 | ACH | $ 81.00 | Not Processed |
| 2/16/11 | ACH | $ 53.00 | Not Processed |
| 2/20/11 | ACH | $ 12.00 | Not Processed |
| 2/22/11 | ACH | $ 57.00 | Not Processed |
| 2/22/11 | ACH | $ 89.00 | Not Processed |

| Date | Method of Payment | Amount Requested | Amount Reported |
|---|---|---|---|
| 2/23/11 | ACH | $ 87.00 | Not Processed |
| 2/24/11 | ACH | $ 56.00 | Not Processed |
| 2/25/11 | ACH | $ 61.00 | Not Processed |
| 3/2/11 | ACH | $ 45.00 | Not Processed |
| 3/2/11 | ACH | $ 71.00 | Not Processed |
| 3/7/11 | ACH | $ 33.00 | Not Processed |
| 3/7/11 | ACH | $ 81.00 | Not Processed |
| 3/8/11 | ACH | $ 57.00 | Not Processed |
| 3/9/11 | ACH | $ 53.00 | Not Processed |
| 3/10/11 | ACH | $ 76.00 | Not Processed |
| 3/10/11 | ACH | $ 34.00 | Not Processed |
| 3/11/11 | ACH | $ 78.00 | Not Processed |

**E.      Plaintiffs Are Unlawfully And Unjustly Denied Access To Their Accounts And To Their Funds Held In Their Accounts**

104.     Prior to April 15, 2011, U.S. players were free to make "cash out" requests to withdraw funds from their Full Tilt accounts at will; cash out requests were generally granted in the ordinary course of business.  However, since the seizure of the Full Tilt U.S. domain name and other assets by the Department of Justice, and the issuance of arrest warrants for Bitar and Burnick, neither of whom are in the country, U.S. players with Full Tilt Player Accounts have been wrongfully denied access to their own funds.  No legitimate explanation has been offered by Full Tilt for refusing to permit U.S. players to cash out their accounts.

105.    In an April 20, 2011 announcement, Manhattan U.S. Attorney Preet Bharara stated that no individual player accounts were frozen by the United States, and that Full Tilt, along with PokerStars, has been at all times free to reimburse any player's deposited funds. Nevertheless, to aid the return of funds with which the Full Tilt enterprise and PokerStarts were entrusted, the Department of Justice entered into explicit agreements with both organizations to facilitate the repatriation of U.S. players' funds.  U.S. Attorney Bharara stated: "The agreements allow for PokerStars and Full Tilt Poker to use the pokerstars.com and fulltiltpoker.com domain names to facilitate the withdrawal of U.S. players' funds held in account with the companies."[1] On May 11th, U.S. Attorney Bharara announced that a similar agreement had been reached with Absolute Poker.  He further stated:

> With this agreement, all three of the companies that allegedly engaged in the . . . massive wire fraud, bank fraud, and money laundering, are moving forward with the process of returning the funds they owe to their U.S. customers. As with the other two companies we named in the Complaint, Absolute Poker has at all times been free to reimburse any player's deposited funds. This Office expects the companies to return the money that U.S. players entrusted to them.[2]

106.    Meanwhile, Full Tilt continues to tell U.S. account holders that their funds are safe and that the Enterprise plans to return their funds to them, yet has continuously failed to do so.

---

[1] Exhibit C, Press Release, United States Attorney for the Southern District of New York, *United States Enters Domain-Name Use Agreements With Two Online Poker Companies*, April 20, 2011.

[2] Exhibit D, Press Release, United States Attorney for the Southern District of New York, *United States Enters Agreement With Online Poker Company Regarding Return of Funds to U.S. Players*, May 11, 2011.

107.   Full Tilt concedes its wrongdoing by repetitively communicating its intentions to fulfill its obligation to refund, return or otherwise reimburse U.S. player funds.  Upon attempting to access their accounts, U.S. account holders receive the following message (or a similar one):

> Unfortunately, due to recent actions by the U.S. government, Full Tilt Poker is unable to accept "real money" play from U.S. players at the current time, and this includes any deposits or withdrawals. We are working to resolve these issues as soon as possible and will keep you updated as information becomes available to us.
>
> We are deeply sorry for this inconvenience, but these events are beyond our control.  Please be assured that your funds are safe, and we thank you for your patience while we do everything in our power to have your money returned to you as soon as possible.
>
> Please contact support@fulltiltpoker.com for more information.

108.   By April 28, 2011, U.S. players were permitted to submit 'cash out' requests to PokerStars.  To date, on information and belief, all cash out requests by U.S. account holders have been honored and processed in a timely manner by PokerStars, including cash out requests for the money value of tournament tickets, VIP rewards, and Frequent Player Points.  In contrast, Full Tilt Poker has not permitted its U.S. players to even make cash out requests, completely denying U.S. players access to their own Player Accounts and to their own funds.

109.   Plainly stated, RICO Defendants ran the Enterprise, and directed the Enterprise to engage in a broad scheme to defraud and lie to U.S. financial institutions, the Federal Reserve, and Plaintiffs, about the nature of their business.  Without doing so, RICO Defendants would have been unable to receive deposits from U.S. players through eChecks or credit cards.  The RICO Defendants, at the helm of the Enterprise, took a calculated risk, betting that their creation of sham entities would be enough to disguise their pattern of wire fraud, bank fraud and money laundering.  The only losers on this bet so far have been the Plaintiffs, who placed their trust—

and their money—in the hands of the RICO Defendants, unaware that their deposits were processed through a massive scheme of fraud and money laundering.

110.    The RICO Defendants conducted the affairs of the Enterprise through a pattern of illegal activity, including by:

a.    Accepting credit and the proceeds of credit, electronic fund transfers and the proceeds of electronic fund transfers, checks, drafts and similar instruments, in connection with illegal gambling;

b.    Conspiring to commit, and committing, bank fraud, with the object of executing a scheme to defraud financial institutions, to obtain monies, funds, credits and other assets by means of false and fraudulent pretenses and representations;

c.    Conspiring to commit, and committing, wire fraud, with the object of communicating and obtaining the ill-gotten gains through communication in interstate and foreign commerce, including a scheme involving wire communications to deceive financial institutions into processing and authorizing payments to and from one or more member entities;

d.    Conspiring to transport and/or transmit, and transporting and/or transmitting, monetary instruments and funds from a place in the U.S. to a place in the U.S. through a place outside of the U.S., with the intention of promoting the carrying on of specified unlawful activity;

e.    Conspiring to engage, and engaging, in monetary transactions in criminally derived property of a value greater than $10,000.

### F.    Plaintiffs' Injuries

111.    Plaintiffs and class members, together, have approximately $150 million dollars locked up in Player Accounts that are controlled by the Enterprise.

112. Plaintiffs and class members have relied on Full Tilt to continue to provide U.S. players access to their own funds. Plaintiffs have suffered as a result of Full Tilt's failure to restore Plaintiffs' and class members' access to their own money.

### G. The RICO Defendants' Pattern of Racketeering Activity Is The Direct and Proximate Cause of The Injuries To Plaintiffs' Property

113. The Enterprise has wrongfully denied account access to U.S. players since April 15, 2011. Effective on that date, the Enterprise has seized the contents of U.S. player accounts, and the accounts themselves.

114. The seizure by the Enterprise of U.S. player funds is a direct and proximate result of the Enterprise's illegal racketeering activities. Absent the frauds committed by the Enterprise, U.S. player funds deposited through credit and eCheck transactions would not have been accepted, and no Plaintiffs who deposited their funds in that manner would have any money in a Full Tilt Poker player account.

## CAUSES OF ACTION

## COUNT I

(Conversion against all Defendants)

115. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

116. All Defendants, by virtue of their control and ownership of the Full Tilt Companies that comprise the Full Tilt umbrella, and/or their ownership stakes in the umbrella undertaking, are liable for conversion of Plaintiffs' and class members' monies and assets (the "property") held in Plaintiffs' and class members' Full Tilt Player Accounts. The Player Accounts and the property therein are currently and wrongfully in the exclusive custody of the Defendants. Plaintiffs and class members deposited and maintained property in their Full Tilt

Player Accounts, and at all relevant times, each maintained a clear possessory interest in, and the right to immediate possession of, his or her property. At all relevant times, each Plaintiff's property has been specifically identifiable because each Plaintiff's property is recorded and/or kept in that Plaintiff's individual Player Account. The same is true for all class members' property. The value of any monies, and the existence of other assets and their dollar values, within each Player Account is tracked and recorded by Full Tilt.

117. At all relevant times, Defendants have been under the obligation to return the properties—or the dollar value of the properties—to Plaintiffs and class members, upon demand. Before April 15, 2011, Plaintiffs and class members generally exercised their possessory interests in, and immediate rights to return of, their properties by making demand in the form of a request to "cash out." Players cashed out by logging into their Player Accounts, navigating to the prominent button on their screens entitled "cashier," selecting a withdrawal amount (in dollars), and selecting a method of withdrawal. When players made their requests to cash out, the Defendants' obligations to permit withdrawal of the desired balances were triggered. Until April 15, 2011, Defendants generally complied with these obligations.

118. On April 15, 2011, Defendants interfered with Plaintffs' and class members' possessory interests and rights by intentionally refusing to honor their cash out requests. Defendants' refusal to honor these cash out requests is ongoing. Defendants' actions on and since April 15, 2011 are inconsistent with Defendants' obligations to Plaintiffs and class members and plainly interfere with each Plaintiff's and each class member's dominion over his or her property.

## COUNT II

(Violation of the RICO Act, 18 U.S.C.S. §§ 2, 1964(c), against RICO Defendants, based on violation of 18 USCS§ 1962(c))

119.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

120.    Wire fraud, bank fraud, and money laundering are "racketeering offenses" under 18 USCS § 1961(1).

121.    The elements of the wire fraud offense are 1) a scheme to defraud, and 2) use of interstate commerce in furtherance of the scheme.  The statute reads, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 USCS § 1343.  The RICO Defendants here engaged in a scheme to defraud Plaintiffs through direct misrepresentations transmitted over the internet.  Among other false promises, the RICO Defendants represented to Plaintiffs, through the internet, an instrument of interstate commerce, that any money they deposited in Full Tilt Player Accounts would be safe and secure, would be processed through safe and secure processors, and could be withdrawn at their convenience, inducing reliance by Plaintiffs.  As a result of the misrepresentations and the other acts of racketeering activity alleged herein, Plaintiffs and other class members deposited their funds in Full Tilt Player Accounts to which they now have no access.

122.    18 USCS § 1344 provides, in relevant part, for criminal penalties for whoever knowingly executes or attempts to execute, a scheme or artifice to 1) defraud a financial

institution, or 2) obtain any funds by means of false or fraudulent pretenses, representations or promises.   Here, RICO Defendants are guilty of bank fraud on both counts: the RICO Defendants purposefully defrauded a number of financial institutions, including federally insured institutions, by ensuring that the gambling code that merchant banks were required to attach to gambling related transactions was omitted from the transaction information sent to issuer banks, and by lying to banks to open accounts under the names of phony merchants, in order to process gambling related funds that the banks otherwise would not have touched.

123.   The RICO Defendants have also violated the federal money laundering statute in a number of ways.   The relevant portions of the money laundering statute provide criminal penalties for:

> (a) (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> (A) (i) with the intent to promote the carrying on of specified unlawful activity; or . . .
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .
> For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.
>
> (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--
>
> (A) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful

activity and knowing that such transportation, transmission, or
transfer is designed in whole or in part--
         (i) to conceal or disguise the nature, the location, the source,
the ownership, or the control of the proceeds of specified unlawful
activity . . . .
      (3) Whoever, with the intent--
       (A) to promote the carrying on of specified unlawful activity;
       (B) to conceal or disguise the nature, location, source,
ownership, or control of property believed to be the proceeds of
specified unlawful activity; or . . .
      conducts or attempts to conduct a financial transaction involving
property represented to be the proceeds of specified unlawful
activity, or property used to conduct or facilitate specified unlawful
activity . . . .
      (7) the term "specified unlawful activity" means-- [*inter alia*,]
      (A) any act or activity constituting an offense listed in section 1961(1) of this title
[18 USCS § 1961(1)] . . . .

18 USCS § 1956.

        124.    RICO Defendants committed and/or conspired to commit money laundering

pursuant to all three sections of the statute.  First, the RICO Defendants knowingly conducted

financial transactions which involved the proceeds of wire fraud and bank fraud, perfectly aware

that the transactions they carried out--including the routing of the funds through fake merchants--

were designed to "to conceal or disguise the nature, the location, the source, the ownership, or

the control of the proceeds of specified unlawful activity."   Second, the RICO Defendants

purposefully transferred U.S. player funds, deposited in the United States, to offshore banks, in

order to have the funds processed pursuant to the eCheck wire fraud in which Defendants

participated.  Finally, the RICO Defendants intended to conceal the truth about the transactions

at issue and have used the proceeds thereof to continue funding the Enterprise's illegal activities,

including paying off third party processors at a higher than market rate to facilitate their deceitful

scheme to get U.S. banks to process Full Tilt's gambling related transactions through the ACH

system.

125. The Plaintiffs and RICO Defendants named above in ¶¶ 18-34 are persons as defined by 18 U.S.C. 1961(3) of the Act.

126. The RICO Defendants and non-Defendant Full Tilt Companies, together, form an enterprise, for purposes of the Act, as defined by 18 U.S.C. § 1961(4).

127. The Full Tilt Enterprise engages in or affects interstate and foreign commerce because it conducts business in the United States and around the world through the Full Tilt website and through live events in the U.S. and abroad; the Enterprise also processes transactions from U.S. and overseas internet poker players, utilizing a number of entities headquartered in the United Kingdom, Aruba, the United States, and elsewhere, and holds accounts in banks around the world, including in the United States and in Switzerland.

128. Each RICO Defendant is an owner, director, or principal of the Full Tilt Undertaking or at least one Full Tilt Company, or is itself a Full Tilt Company, and all are members of the Enterprise.

129. The purpose of the Enterprise was to process U.S. player funds for Full Tilt. The RICO Defendants usurped the Enterprise and directed the Enterprise's foray into wire, bank fraud, and money laundering in order to derive profit for Full Tilt and for themselves from the U.S. market.

130. Between 2006 and April 15, 2011, each RICO Defendant participated in the Enterprise's commission of the illegal acts. Specifically, RICO Defendants were in a position to conduct the affairs of the Enterprise, and did conduct the affairs of the Enterprise, through a pattern of illegal activity including conspiracy to commit bank fraud, wire fraud and to launder money.

131.    Furthermore, the RICO Defendants were successful in their scheme, and did in fact commit bank fraud, wire fraud and money laundering offenses, in violation of 18 U.S.C.S. §§ 1343, 1344, and 1956.

132.    RICO Defendants committed wire and bank fraud and money laundering in connection with the following deposits and withdrawals in a U.S. player's account through the Fulltiltpoker.com website.  Defendants are culpable as actors or as persons who caused the following acts to be committed:

a.    Between at least 2006 and March 2011, the RICO Defendants relied on (and handsomely compensated) third party payment processors, to whom Defendants handed over U.S. player funds.  The third party processors, who lied to the U.S. banks about the transactions they were processing.  With the third party payment processors, the Enterprise deceived U.S. banks and financial institutions into unknowingly processing millions of dollars in funds for Full Tilt Poker.

b.    For example, on March 30, 2010, a U.S. resident ("Doe") requested deposit of $30 via eCheck, from his personal bank account in New York, and that sum was accepted and deposited into Doe's account.  The transaction was processed through a sham company, under that fictitious entity's name.  The fake company established a processing account with a U.S. bank (a U.S. based "ODFI" or "Originating Depository Financial Institution"), in order to process the funds through ACH, which is only available for transactions with an ODFI on both sides.

c.    On March 31, 2010, Doe requested deposit of $100 using a Visa card, and that sum was also accepted and deposited into Doe's account.  The transaction was processed through a sham company, which deceitfully initiated the credit card charges by setting up and

using an offshore bank account.  The transaction was processed without the required gambling code, resulting in the extension of credit for a transaction that would otherwise be instantly denied.  The credit card transactions appeared to be initiated entities that were completely unrelated to the Enterprise.  In reality, these entities were no more than temporary disguises with which the Enterprise shrouded credit card transactions to and from U.S. players.

        d.      Between March 30, 2010 and November 15, 2010, Doe made upwards of 50 deposit requests, via credit card and eCheck, into his player account and all were accepted.[3] As a practical matter, it was not possible for an eCheck or Visa card transaction to be processed in any manner other than through the frauds described, since banks would not process the funds or hold an account for a known Full Tilt entity

        e.      Between March of 2010 and March of 2011, Doe also made withdrawal requests.  Doe's funds were paid by automated credit or by paper check; however the payments to Doe were not made in the name of any known entity associated with Full Tilt Poker.  Instead, the payments to Doe came from accounts under the names of "Arrow Checks," "TLC Global," and "Eastern Expressions," among others.

    133.    "Arrow Checks", "TLC Global," and "Eastern Expressions" are just some of the sham companies that the Enterprise set up pursuant to the wire fraud, bank fraud and money laundering operations it ran.  These are conspiracies to commit, and commissions of, "predicate acts" constituting "racketeering activities" pursuant to that term's definition by the RICO Act. 18 U.S.C. § 1961(1).

---

[3] It wasn't until January of this year that a deposit request from Doe was made but not accepted.

134.   In addition to committing those fraudulent transactions, the Enterprise misrepresented the nature of the transactions in which Plaintiffs would be engaging by placing simple deposit requests. Plaintiffs were specifically promised that:

> Full Tilt Poker works hard to ensure that playing for real money is easy, safe and secure by:
>
> - Providing a variety of safe and secure <u>payment processors</u> [indicating link] to make depositing money fast and easy.
>
> - Ensuring any money you have on deposit with Full Tilt Poker is completely <u>safe and secure</u> [indicating link].
>
> - Protecting your <u>valuable personal information</u> [indicating link].
>
> - Processing <u>withdrawals</u> [indicating link] quickly and efficiently.

135.   These material misrepresentations, made to millions of U.S. residents, including residents in the State of New York, were made through the fulltiltpoker.com website at all or some relevant times. The purposes of these representations were to convince U.S. residents to deposit funds, which the Enterprise would then fraudulently process and illegally launder, unbeknownst to the depositors.

136.   Occurring within a ten year span of time, these actions constitute a "pattern of racketeering activity," as defined by the Act. 18 U.S.C. § 1961(5).

137.   The RICO Defendants' racketeering activities, committed through the conduct of the affairs of the Enterprise, violated 1962(c) and directly and proximately resulted in the termination of the enterprise and the injury complained of herein—the effective freezing of the U.S. Player Accounts by Full Tilt. The RICO Defendants directly and proximately caused the acceptance of U.S. player deposits under circumstances that the RICO Defendants knew could lead to the collapse and seizure of Full Tilt, or other interference with Full Tilt's obligation to make account holders' funds available.

138.    Accordingly, Plaintiffs and class members are entitled, under 1964(c), to threefold the damages they have sustained and the cost of the suit, including a reasonable attorney's fee.

## COUNT III

**(Violation of the RICO Act, 18 U.S.C.S. §§ 2, 1964(c), against RICO Defendants, based on violation of 18 USCS§ 1962(c) and (d))**

139.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

140.    RICO Defendants committed and/or conspired to commit money laundering pursuant to all three sections of the statute.  First, the RICO Defendants knowingly conducted financial transactions which involved the proceeds of wire fraud and bank fraud, perfectly aware that the transactions they carried out--including the routing of the funds through fake merchants-- were designed to "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  Second, the RICO Defendants purposefully transferred U.S. player funds, deposited in the United States, to offshore banks, in order to have the funds processed pursuant to the eCheck wire fraud in which Defendants participated.  Finally, the RICO Defendants intended to conceal the truth about the transactions at issue and have used the proceeds thereof to continue funding the Enterprise's illegal activities, including paying off third party processors at a higher than market rate to facilitate their deceitful scheme to get U.S. banks to process Full Tilt's gambling related transactions through the ACH system.

141.    Between 2006 and April 15, 2011, each RICO Defendant aided and abetted the illegal acts, and/or conspired to accomplish the illegal acts.  All RICO Defendants were in a position to conduct the affairs of the Enterprise, and did conduct the affairs of the Enterprise,

through a pattern of illegal activity including aiding and abetting bank fraud, wire fraud and money laundering and/or conspiring to commit bank fraud, wire fraud and money laundering..

142.    The RICO Defendants aided and abetted the wire and bank fraud in connection with deposits and withdrawals in U.S. Player Accounts through the fulltiltpoker.com website by directing that sham companies be set up to cover up the Enterprise's actions, that offshore merchant banks be lied to regarding the nature of the merchant transactions, and the credit card networks be defrauded into extending credit for a transaction it wouldn't normally have touched. The RICO Defendants are culpable under 18 U.S.C. § 1964(c) through their violations of the fraud statutes and as principals (§ 2) who caused the following acts to be committed in violation of § 1962(c):

        a.      Using the wires and/or mail to contract with third party e-check processors, and to directly or indirectly instruct that the processors open merchant accounts under phony names at U.S. ODFIs to gain access to the ACH system.

        b.      Using the wires to defraud U.S. banks by setting in motion the scheme to set up merchant accounts in offshore banks in fake names.

        c.      Using the wires to direct that websites be created to help cover up the fact that the Full Tilt Enterprise had made up the phony companies in its ploy to trick U.S. financial institutions into helping it separate U.S. players from their money.

        d.      Promoting the Full Tilt brand and encouraging U.S. players to deposit money in Full Tilt through television appearances and through statements made on internet websites.  Defendants encouraged U.S. players to execute transactions with Full Tilt poker despite the fact that doing so required players to unknowingly engage in a fraudulent scheme to coat the RICO Defendants' pockets.

143.    Alternatively and/or in addition, the RICO Defendants are culpable for Plaintiffs' injuries because they conspired to commit the racketeering activities that directly injured the Plaintiffs. The following overt and independently wrongful acts were committed by the RICO Defendants in furtherance of the scheme to illegally launder U.S. players' money and to commit wire and bank fraud:

a.      Using the wires and/or mail to contract with third party e-check processors, and to directly or indirectly instruct that the processors open merchant accounts under phony names at U.S. ODFIs to gain access to the ACH system.

b.      Using the wires to defraud U.S. banks by setting in motion the scheme to set up merchant accounts in offshore banks in fake names.

c.      Using the wires to direct that websites be created to help cover up the fact that the Full Tilt Enterprise had made up the phony companies in its ploy to trick U.S. financial institutions into helping it separate U.S. players from their money.

d.      Promoting the Full Tilt brand and encouraging U.S. players to deposit money in Full Tilt through television appearances and through statements made on internet websites. Defendants encouraged U.S. players to execute transactions with Full Tilt poker despite the fact that doing so required players to unknowingly engage in a fraudulent scheme to coat the RICO Defendants' pockets.

144.    In addition to aiding and abetting and/or conspiring to commit the fraudulent transactions, the RICO Defendants conspired to misrepresent, and/or aided and abetted the misrepresentation of, the nature of the transactions in which Plaintiffs would be engaging when Plaintiffs placed a simple deposit request.  Plaintiffs  were specifically promised that:

> Full Tilt Poker works hard to ensure that playing for real money is
> easy, safe and secure by:

- Providing a variety of safe and secure payment processors [indicating link] to make depositing money fast and easy.

- Ensuring any money you have on deposit with Full Tilt Poker is completely safe and secure [indicating link].

- Protecting your valuable personal information [indicating link].

- Processing withdrawals [indicating link] quickly and efficiently.

145.    These material misrepresentations, made to millions of U.S. residents, including residents in the State of New York, were made through the fulltiltpoker.com website at all or most relevant times.  The RICO Defendants caused this misrepresentation to be made for the purposes of convincing U.S. residents to deposit funds, which the Enterprise would then fraudulently process and illegally launder, unbeknownst to the depositors.

146.    Occurring within a ten year span of time, the actions described above constitute a "pattern of racketeering activity," as defined by the Act. 18 U.S.C. § 1961(5).

147.    Through RICO Defendants' aiding and abetting of racketeering activities, and/or defendants participation in a conspiracy that constitutes racketeering activity, the RICO Defendants violated 1962(c) by aiding and abetting the racketeering activities, and/or violated 1962(d) by conducting the affairs of the enterprise through a conspiracy to commit the frauds described above.  By doing so, the RICO Defendants directly and proximately caused the acceptance of U.S. player deposits under circumstances that the RICO Defendants knew could lead to the collapse and Seizure of Full Tilt, or other interference with Full Tilt's obligation to make account holders' funds available.

148.    The U.S. player deposits would not, as a practical and a legal matter, have been accepted but for the fraud and the Enterprise would not have control over the U.S. player funds as they currently do, nor the ability to withhold the U.S. player funds, as they currently are.

149.    Here, because the RICO Defendants aided and abetted the racketeering activity, as defined in §1961, an/or because the RICO Defendants purposefully and deceitfully conducted the affairs of the Enterprise though a conspiracy to separate Plaintiffs from their money, and committed overt acts in furtherance thereof, rendering Defendants culpable for violation of § 1962(d), Plaintiffs and class members are entitled, under 1964(c), to threefold the damages they have sustained and the cost of the suit, including a reasonable attorney's fee.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that Defendants, each of them, have violated 18 U.S.C.S. § 1962(c) or §1962(d);

B.    An Order enjoining the Defendants from continuing to block the Plaintiffs' and class members' access to their Full Tilt Player Accounts;

C.    An Order demanding that the Defendants refund Plaintiffs and class members the dollar amounts, in U.S. dollars, of the assets, funds, monies and other property in their Player Accounts just before seizure of Full Tilt's assets by the Department of Justice, plus interest as provided by applicable law;

D.    An Order demanding that, in addition, the Defendants pay to each Plaintiff and class member threefold the damages sustained, as determined by the Court;

E.    An Order awarding costs pursuant to 18 U.S.C. 1964(c);

F.    An Order awarding reasonable attorney fees pursuant to 18 U.S.C. 1964(c).

G.    An Order awarding a reasonable incentive fee for named class representatives;

H.    Such other and further relief as this Court may determine to be just and necessary.

## **Jury Demand**

Plaintiffs hereby demand a trial by jury.


DATED: June 30, 2011

Thomas H. Burt (TB 7601)
Lawrence P. Kolker (LK 6432)
Gregory M. Nespole (GN 6820)
Beth A. Landes (BL 0909)
Wolf Haldenstein Adler
   Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653


/661318