# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,                    :

          Plaintiff,                          :

       - v. -                                    :

POKERSTARS; FULL TILT POKER;                 :
ABSOLUTE POKER; ULTIMATE BET;
OLDFORD GROUP LTD.; RATIONAL                 :
ENTERTAINMENT ENTERPRISES LTD.;
PYR SOFTWARE LTD.; STELEKRAM LTD.; :
SPHENE INTERNATIONAL LTD.;
TILTWARE LLC; KOLYMA CORPORATION  :
A.V.V.; POCKET KINGS LTD.; POCKET
KINGS CONSULTING LTD.; FILCO LTD.; :
VANTAGE LTD.; RANSTON LTD.; MAIL
MEDIA LTD.; FULL TILT POKER LTD.;  :
SGS SYSTEMS INC.; TRUST SERVICES
LTD; FIDUCIA EXCHANGE LTD.; BLUE    :
WATER SERVICES LTD.; ABSOLUTE
ENTERTAINMENT, S.A.; and BLANCA      :
GAMES, INC. OF ANTIGUA;

                                                     :

          Defendants;                         :

                                                     :

ALL RIGHT, TITLE AND INTEREST IN            :
THE ASSETS OF POKERSTARS; FULL
TILT POKER; ABSOLUTE POKER;                  :
ULTIMATE BET; OLDFORD GROUP LTD.;  :
RATIONAL ENTERTAINMENT ENTERPRISES
LTD.; PYR SOFTWARE LTD.; STELEKRAM :
LTD.; SPHENE INTERNATIONAL LTD.;
TILTWARE LLC; KOLYMA CORPORATION   :
A.V.V.; POCKET KINGS LTD.; POCKET
KINGS CONSULTING LTD.; FILCO LTD.; :
VANTAGE LTD.; RANSTON LTD.; MAIL
MEDIA LTD.; FULL TILT POKER LTD.;  :
SGS SYSTEMS INC.; TRUST SERVICES
LTD; FIDUCIA EXCHANGE LTD.; BLUE    :
WATER SERVICES LTD.; ABSOLUTE
ENTERTAINMENT, S.A.; and BLANCA      :
GAMES, INC. OF ANTIGUA; INCLUDING
BUT NOT LIMITED TO THE PROPERTIES   :
LISTED IN SCHEDULE A, SUCH AS BUT
NOT LIMITED TO THE DOMAIN NAMES     :
POKERSTARS.COM; FULLTILTPOKER.COM;
ABSOLUTEPOKER.COM;                        :

JUDGE SAND

VERIFIED COMPLAINT

11 Ci CIV 2564



RECEIVED
APR 14 2011
U.S.D.C. S.D. N.Y.
CASHIERS

ULTIMATEBET.COM; and UB.COM; and          :
ALL RIGHT, TITLE, AND INTEREST IN
THE PROPERTIES LISTED IN SCHEDULE         :
B;

                                          :

          Defendants-in-rem.
- - - - - - - - - - - - - - - - - -x

          Plaintiff United States of America, by its attorney,

Preet Bharara, United States Attorney for the Southern District

of New York, for its complaint, upon information and belief,

alleges as follows:

                    I.   INTRODUCTION

          1.   From at least in or about November 2006, and

continuing through in or about April 2011, the three leading

internet poker companies doing business in the United States were

PokerStars, Full Tilt Poker and Absolute Poker/Ultimate Bet

(collectively the "Poker Companies").  Because United States

banks were largely unwilling to process payments for an illegal

activity such as internet gambling, the three Poker Companies

used fraudulent methods to avoid these restrictions and to

receive billions of dollars from United States residents who

gambled through the Poker Companies.

          2.   The principals of the Poker Companies, including

Isai Scheinberg ("Scheinberg") and Paul Tate ("Tate") of

PokerStars, Scott Tom ("Tom") and Brent Beckley ("Beckley") of

Absolute Poker, and Raymond Bitar ("Bitar") and Nelson Burtnick

("Burtnick") of Full Tilt Poker; and others working in concert

                          2

with the Poker Companies and on their behalf, deceived or
directed others to deceive United States banks and financial
institutions into processing billions of dollars in payments for
the Poker Companies, by, among other things, arranging for the
money received from United States gamblers to be disguised as
payments to hundreds of non-existent online merchants and other
non-gambling businesses.

3.    To accomplish this deceit, Scheinberg, Bitar,
Beckley, Burtnick, and Tate relied on highly compensated third
party payment processors (the "Poker Processors") who lied to
United States banks about the nature of the financial
transactions they were processing and covered up those lies
through the creation of phony corporations and websites to
disguise payments to the Poker Companies.  These Poker Processors
included, among others, Ryan Lang ("Lang"), Bradley Franzen
("Franzen"), Ira Rubin ("Rubin"), and Chad Elie ("Elie"), who, at
various times relevant to this Complaint, processed and helped
disguise payments to each of the three Poker Companies.

4.    Working together, the Poker Companies and Poker
Processors deceived United States banks and financial
institutions - including banks insured by the Federal Deposit
Insurance Corporation - into processing billions of dollars in
gambling transactions for the Poker Companies.  Approximately
one-third or more of the funds deposited by gamblers went

3

directly to the Poker Companies as revenue through the "rake" the Poker Companies charged players on almost every poker hand played online.

5.     On or about March 10, 2011, a Grand Jury sitting in the Southern District of New York returned a nine-count Superseding Indictment, S3 10 Cr. 336 (LAK) (the "Indictment") charging Scheinberg, Bitar, Tom, Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and John Campos ("Campos") with conspiring to violate the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5363 and 5366, in violation of Title 18, United States Code, Section 371 (Count One); violating UIGEA, Title 31, United States Code, Sections 5363 and 5366 (Counts Two, Three, and Four); conducting illegal gambling businesses, in violation of Title 18, United States Code, Section 1955 (Counts Five, Six, and Seven); conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349 (Count Eight); and conspiring to launder money, in violation of Title 18, United States Code, Section 1956(h) (Count Nine).  A true and correct copy of the Indictment is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

6.     In the instant civil money laundering action and in rem forfeiture action, the United States of America seeks civil monetary penalties for money laundering against Pokerstars;

4

Full Tilt Poker; Absolute Poker; Ultimate Bet; Oldford Group
Ltd.; Rational Entertainment Enterprises Ltd.; Pyr Software Ltd.;
Stelekram Ltd.; Sphene International Ltd.; Tiltware LLC; Kolyma
Corporation A.V.V.; Pocket Kings Ltd.; Pocket Kings Consulting
Ltd.; Filco Ltd.; Vantage Ltd.; Ranston Ltd.; Mail Media Ltd.;
Full Tilt Poker Ltd.; SGS Systems Inc.; Trust Services Ltd.;
Fiducia Exchange Ltd.; Blue Water Services Ltd.; Absolute
Entertainment, S.A.; and Blanca Games, Inc. of Antigua (the
"Defendants").

             7.    The United States of America further seeks the
forfeiture of all right, title and interest in the assets of the
Defendants, including but not limited to the properties set forth
in Schedule A to this Complaint, such as but not limited to the
domain names pokerstars.com, fulltiltpoker.com,
absolutepoker.com, ultimatebet.com, and ub.com, as well as the
properties set forth in Schedule B to this Complaint, consisting
of accounts used by payment processors for the Poker Companies
and accounts into which proceeds were transferred from the
payment processor accounts (collectively, the "Defendant
Properties"). The Defendant Properties are subject to
forfeiture, (1) pursuant to Title 18, United States Code, Section
1955(d), as properties used in violation of the provisions of
Section 1955; (2) pursuant to Title 18, United States Code,
Section 981(a)(1)(C), as properties constituting or derived from

proceeds traceable to violations of Section 1955; (3) pursuant to
Title 18, United States Code, Section 981(a)(1)(C), as properties
constituting or derived from proceeds traceable to a conspiracy
to commit wire fraud and bank fraud; and (4) pursuant to Title
18, United States Code, Section 981(a)(1)(A), as properties
involved in transactions and attempted transactions in violation
of Sections 1956 and 1957, or property traceable to such
property.

       8.    The Defendants are further subject to civil
penalties, pursuant to Title 18, United States Code, Section
1956(b), of the value of the property, funds, and monetary
instruments involved in transactions the Defendants conducted and
attempted to conduct in violation of Section 1956(a)(1) and
(a)(3) and section 1957, and transmissions and transfers the
defendants conducted and attempted to conduct in violation of
Section 1956(a)(2).

       9.    On or about March 21, 2011, the Honorable Lewis A.
Kaplan, United States District Judge, Southern District of New
York, issued a restraining order with respect to several of the
Defendant Properties finding probable cause that these properties
are subject to forfeiture pursuant to Title 18, United States
Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), and 1955(d)
and Title 28, United States Code, Section 2461(c). A true and
correct copy of the Declaration of Special Agent Rosemary Karaka

6

of the Federal Bureau of Investigation ("FBI") (the "Karaka Decl.") submitted in support of the Government's application for the restraining order is annexed hereto as Exhibit B and is incorporated by reference as if fully set forth herein.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

11. Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

12. Venue is further proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the Southern District of New York.

13. Venue is further proper pursuant to Title 18, United States Code, Section 1956(i) because the financial or monetary transactions were conducted in part in the Southern District of New York; because a prosecution for the underlying specified unlawful activity could be brought in the Southern District of New York and the Defendants participated in the transfer of the proceeds of the specified unlawful activity from this District to districts where financial and monetary transactions were conducted; and because the Defendants conspired to violate Section 1956 and venue for the completed offense lies

7

in the Southern District of New York and acts in furtherance of
the conspiracy took place in the Southern District of New York.

### III.  THE PARTIES

14.  At all times relevant to this Complaint,
Scheinberg was a founder, owner, and principal decision-maker for
PokerStars, an internet poker company founded in or about 2001
with headquarters in the Isle of Mann.  Through its website,
pokerstars.com, PokerStars provided real-money gambling on
internet poker games to United States customers.  At various
times relevant to this Complaint, PokerStars did business through
several privately held corporations and other entities, including
but not limited to Oldford Group Ltd., Rational Entertainment
Enterprises Ltd., Pyr Software Ltd., Stelekram Ltd. and Sphene
International Ltd. (collectively, "Pokerstars").

15.  At all times relevant to this Complaint, Bitar was
a founder, owner, and principal decision-maker for Full Tilt
Poker, an internet poker company founded in or about 2004 with
headquarters in Ireland.  Through its website, fulltiltpoker.com,
Full Tilt Poker provided real-money gambling on internet poker
games to United States customers.  At various times relevant to
this Complaint, Full Tilt Poker did business through several
privately held corporations and other entities, including but not
limited to Tiltware LLC, Kolyma Corporation A.V.V., Pocket Kings
Ltd., Pocket Kings Consulting Ltd., Filco Ltd., Vantage Ltd.,

8

Ranston Ltd., Mail Media Ltd., and Full Tilt Poker Ltd.
(collectively, "Full Tilt Poker"). As of March 2011, Full Tilt
Poker was the second-largest poker operator offering gambling on
poker games to United States residents.

16. At certain times relevant to this Complaint, Tom
and his step-brother Beckley were founders and/or principal
decision-makers for Absolute Poker, an internet poker company
founded in or about 2003 with its headquarters in Costa Rica.
Through its websites, absolutepoker.com, ultimatebet.com, and
ub.com, Absolute Poker provided real-money gambling on internet
poker games to United States customers. At various times
relevant to this Complaint, Absolute Poker did business through
several privately held corporations and other entities, including
but not limited to SGS Systems Inc., Trust Services Ltd, Fiducia
Exchange Ltd., Blue Water Services Ltd., and Absolute
Entertainment, S.A. In or around October 2006, Tokwiro
Enterprises was identified as the owner of record of Absolute
Poker and a companion poker and blackjack gambling website,
Ultimate Bet. In around August 2010, ownership of Absolute Poker
and Ultimate Bet was transferred to Blanca Games, Inc. of Antigua
(collectively, these entities are "Absolute Poker").

17. At certain times relevant to this Complaint,
Burtnick was an executive in the payment processing departments
of PokerStars and Full Tilt Poker. From in or about October 2006

9

through in or about November 2008 Burtnick was an employee in the payment processing department of PokerStars, where he ultimately served as the head of payment processing.  From in or about January 2009 up to and including in or about March 2011, Burtnick served as head of the payment processing department for Full Tilt Poker.

18.  From at least in or about the summer of 2006 up to and including in or about March 2011, Tate was an employee of PokerStars, including in the payment processing department.  From in or about early 2009, up to and including in or about March 2011, Tate served as the head of the payment processing department for PokerStars.

19.  From at least in or about October 2006, up to and including at least in or about the spring of 2010, Lang worked with the Poker Companies to identify Poker Processors willing to process payments for the Poker Companies, including through deceptive means.  In this capacity, Lang acted as an intermediary between principals of the Poker Companies, including defendants Scheinberg, Bitar, Beckley, Burtnick and Tate, and the Poker Processors.

20.  From at least in or about 2007, up to and including on or about March 2011, Franzen worked with internet gambling companies including the Poker Companies, to identify Poker Processors willing to process payments for the Poker

10

Companies, including through deceptive means. In this capacity,
Franzen acted as an intermediary between principals of the Poker
Companies, including defendants Beckley and Burtnick, and the
Poker Processors.

21. From at least in or about 2007, up to and
including in or about March 2011, Rubin processed payments for
various internet gambling companies, including each of the Poker
Companies, by disguising the payments as payments to dozens of
phony internet merchants.

22. From at least in or about the summer of 2008, up
to and including in or about March 2011, Elie together with
others, opened bank accounts in the United States, including
through deceptive means, through which each of the Poker
Companies received payments from United States-based gamblers.

23. From at least in or about September 2009, up to
and including in or about March 2011, Campos was the Vice
Chairman of the Board of Directors and part owner of SunFirst
Bank in St. George, Utah, which processed payments for PokerStars
and Full Tilt Poker.

### IV.  FACTUAL ALLEGATIONS

#### The Enactment of the UIGEA

24. On or about October 13, 2006, the United States
enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"),
making it a federal crime for gambling businesses to "knowingly

11

accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling." Following the passage of the UIGEA, leading internet gambling businesses – including the leading internet poker company doing business in the United States at that time - terminated their United States operations.

     25.   On various dates in October 2006, notwithstanding the passage of the UIGEA, the Poker Companies issued public statements indicating that they intended to continue offering gambling on internet poker in the United States.  For example, in an October 16, 2006 press release, Absolute Poker – whose United States citizen founders had relocated to Costa Rica - noted that Absolute Poker was a "privately held operation, which gives our business model more flexibility and creativity in operating." Absolute Poker also claimed that its payment transactions were done "within the framework of the international banking system, which the U.S. Congress has no control over."

**The Scheme to Defraud**

     26.   As set forth more fully below, at most times relevant to this Complaint, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from

12

United States gamblers.   Instead, both prior to and particularly
after the passage of the UIGEA, the principals of the Poker
Companies, including Scheinberg, Bitar, Tom, Beckley, Burtnick
and Tate, operated through various deceptive means designed to
trick United States banks and financial institutions into
processing gambling transactions on the Poker Companies' behalf.

### Fraudulent Credit Card Processing

27.   Beginning in or about 2001, credit card companies
Visa and MasterCard introduced regulations requiring member banks
that processed credit card transactions for merchants (so-called
"acquiring banks") to apply a particular transaction code to
internet gambling transactions.   Thereafter, certain U.S. banks
that issued credit cards to U.S. consumers (so-called "issuing
banks") elected not to extend credit to customers for internet
gambling purposes and as a matter of policy automatically
declined transactions bearing that internet gambling transaction
code.   The number of U.S. issuing banks declining such
transactions increased significantly over time such that, even
prior to the passage of the UIGEA in October 2006, most United
States banks blocked transactions containing the internet
gambling code.

28.   In order to circumvent the Visa and MasterCard
regulations and trick U.S. banks into authorizing their internet
gambling transactions, Scheinberg, Bitar, Beckley, Burtnick and

13

Tate, worked with and directed others to apply incorrect transaction codes to their respective Poker Companies' internet gambling transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to internet gambling.

29.   One method used by the members of the conspiracy to trick the United States banks into approving internet gambling charges involved the creation of phony non-gambling companies that the Poker Companies used to initiate the credit card charges.  At various times alleged in this Complaint, Bitar, Beckley, and Burtnick worked with other members of the conspiracy to create such fictitious companies - including phony online flower shops and pet supply stores - that established Visa and MasterCard merchant processing accounts with offshore banks. When Full Tilt Poker and Absolute Poker processed a transaction through one of these phony companies without applying a gambling code to the transaction, the United States issuing bank would be tricked into approving the gambling transaction even if its policy was to not allow the extension of credit for internet gambling.  Because the credit card networks were often able to detect the fraudulent nature of these phony merchants after a period of time and to shut down processing for those phony merchants, Bitar, Beckley and Burtnick, and their co-conspirators, arranged for a supply of stand-by phony merchants

14

to be used when a particular phony merchant was discovered.  For example, an Absolute Poker document from in or around the fall of 2007 identifies approximately twenty phony internet shopping companies then being used by Absolute Poker to disguise credit card transactions, including, among others, www.petfoodstore.biz and www.bedding-superstore.tv.

    30.  A second method used by the members of the conspiracy to trick United States banks involved the use of certain pre-paid credit cards.  At various times alleged in this Complaint, the Poker Companies, through, among others, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-conspirators, developed so-called "stored value cards" - such as pre-paid debit cards or even pre-paid "phone" cards - that could be "loaded" with funds from a U.S. customer's credit card without using a gambling transaction code.  Once "loaded" in this way, the stored value cards were used by gamblers almost exclusively to transfer funds to Poker Companies and other gambling companies.  To avoid detection, Scheinberg, Bitar, Beckley, Burtnick, and Tate, and their co-conspirators, arranged for fake internet web sites and phony consumer "reviews" of the stored value cards so that it would appear that the stored value cards had some other legitimate purpose.

## Fraudulent E-Check Processing

31. Because Visa and MasterCard sought to identify and
block attempts to circumvent their rules requiring internet
gambling transactions to be correctly identified - so that banks
could decline to accept them if they wished - the Poker Companies
were unable to process credit card transactions consistently,
even through their use of fraudulent means. Accordingly,
Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others,
worked with and directed others to develop yet another method of
deceiving United States banks and financial institutions into
processing their respective Poker Companies' internet gambling
transactions, through fraudulent e-check processing.

32. At all times relevant to this Complaint, the
Automated Clearinghouse (or "ACH") system was an electronic
network, administered by the Federal Reserve, that allowed for
electronic fund transfers to and from United States bank accounts
through "e-checks" or "electronic checks." At various times
relevant to this Complaint, the Poker Companies, through among
others Scheinberg, Bitar, Beckley, Burtnick, and Tate,
increasingly focused their payment systems on e-checks.

33. A principal difficulty for the Poker Companies in
e-check processing was that the ACH system required the merchant
to open a processing account at a United States-based Originating
Depository Financial Institution (or "ODFI"). Because the Poker

16

Companies were not legally able to offer gambling in the United States, the Poker Companies could not - and did not - seek to open bank accounts for e-check processing in the names of their businesses.  Instead, the Poker Companies found third parties - the Poker Processors - willing to open the bank accounts and process these e-check transactions on behalf of the Poker Companies using the names of phony companies.

34.  In furtherance of this aspect of the scheme, Scheinberg, Bitar, Beckley, Burtnick, and Tate, among others, relied on various middlemen, including Lang and Franzen, to connect their respective Poker Companies with payment processors willing to handle internet poker e-check transactions.  Following these introductions, Scheinberg, Bitar, Beckley, Burtnick, and Tate entered into processing agreements with certain of the e-check processors.  The agreements provided the e-check processors with fees for processing each e-check transaction that were substantially higher than fees paid for standard e-check processing for legitimate, non-gambling merchants.  The Poker Companies, including through Scheinberg, Bitar, Beckley, Burtnick, and Tate, then worked with the e-check processors and other co-conspirators to disguise the Poker Companies' receipt of gambling payments so that the transactions would falsely appear to United States banks as non-gambling transactions.

17

35. At all times relevant to this Complaint, the Poker Companies, through Scheinberg, Bitar, Beckley, Burtnick, and Tate, and others, and the e-check processors, typically accomplished fraudulent e-check processing as follows:

a. First, the e-check processors – sometimes directly, and sometimes through third parties – opened bank accounts at United States-based ODFI banks in order to process the Poker Companies' e-check transactions through the ACH system. The e-check processors typically lied to the ODFI bank about the purpose of the account, falsely claiming that the account would be used to process e-checks for a wide variety of lawful e-commerce merchants without disclosing that, in fact, they would be used to process internet gambling transactions. In some cases, the e-check processors offered specific lies about the identity of these purported e-commerce merchants. In several cases, for example, the e-check processors falsely told the banks that the transactions were for particular purported internet shopping sites, such as an online store selling watches, when, in reality, as the e-check processors well knew, the transactions were for the Poker Companies.

b. Second, the e-check processors worked with the Poker Companies, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate, in the creation of dozens of phony corporations and corresponding websites so that the money debited

18

from U.S. customer's banks would falsely appear to United States banks to be consumer payments to non-gambling related businesses. For example, in or about mid-2008, Rubin, together with co-conspirators, created dozens of phony e-commerce websites purporting to sell everything from clothing to jewelry to golf clubs to bicycles which, in reality, and as Rubin and his co-conspirators well knew, would in fact be used to disguise PokerStars's gambling transactions. In another example, in or around June 2009, Franzen, the defendant, working with multiple co-conspirators, created a phony business called "Green2YourGreen" to be used to disguise payments from U.S. gamblers destined for each of the Poker Companies. Franzen's co-conspirators falsely told multiple United States banks insured by the FDIC, including Citibank and Wells Fargo Bank, among others, that "Green2YourGreen" was a "direct sales" business that allowed consumers to buy environmentally friendly household products and sell them to other consumers in return for commissions. Indeed, the phony Green2YourGreen website that Franzen's co-conspirators created to disguise the gambling transactions listed numerous products that were purportedly for sale and contained "testimonials" about the benefits of green living.

        c.    The development and selection of phony merchants and websites to serve as cover for the poker processing was conducted in close coordination with the Poker Companies

themselves, including with Scheinberg, Bitar, Beckley, Burtnick, and Tate. When a U.S. gambler entered his or her checking account information on one of the Poker Company's websites, the e-check transaction was submitted through the ACH system using the name of one of the phony businesses rather than the name of the Poker Company, and the charge appeared on the customer's bank account under this phony name. The e-check processors' computer systems communicated with the computer systems of the Poker Companies so that when a gambler entered e-check information on one of the Poker Operator's websites, the gambler and Poker Operator received notice of the name of the phony merchant that would appear on the customer's bank account statement, in lieu of the name of the Poker Company, as having initiated the charge. For example, for a time PokerStars used "oneshopcenter" and "mygolflocations" to appear as the party initiating the charges on gamblers' bank statements. At the time, "oneshopcenter.com" and "mygolflocation.com" were purported internet merchants that falsely claimed to sell clothing and jewelry (for oneshopcenter.com) and golf clubs (for mygolflocation.com).

d. Similarly, the Poker Companies worked with the Poker Processors to coordinate responses to customer inquiries to the phony merchants, including the complaints of gamblers confused by the phony merchant name appearing on their checking account statement. For example, in or around March 2009, Gambler

20

1 and Gambler 2 sent e-mails to purported customer service

addresses listed by oneshopcenter.com and mygolflocation.com

regarding attempts to purchase particular items.  Gambler 1 and

Gambler 2 received responses not from these websites, but from

individuals identifying themselves as customer service employees

of PokerStars replying from e-mail addresses associated with

PokerStars.

> e.   Tracking all of the phony merchants used to

disguise gambling transactions created administrative and

technical difficulties for the Poker Companies.  For example, a

PokerStars document from in or about May 2009 provided as

follows:

> It's not unusual for PokerStars to have their
> transactions identified by 30+ descriptors
> [the name of the merchant appearing on the
> consumer's credit card or checking account]
> at any point in time.  The purpose of a
> descriptor is to help the customer identify
> the source of the transaction, be it credit
> card or electronic funds transfer.
> Unfortunately PokerStars does not have this
> luxury; relying on whatever descriptor the
> processor can get approved by the bank.
> These descriptors are diverse, often vague
> and rarely reflect the nature of the
> transaction in any way.  In fact most
> descriptors strongly imply the transaction
> has nothing to do with PokerStars (i.e.
> BICYCLEBIGSHOP.COM, GOLFSHOPCENTER.COM,
> VENTURESHOPPING.COM etc).  Whilst some players
> read confirmation emails and understand the
> process, many do not and it is all too easy
> for a player to say to their bank "I've never
> made a purchase at BICYCLEBIGSHOP.COM".  As a
> result chargebacks (Not Auth & Stop Payments)
> are increasing which in turn jeopardizes the

> relationship with the processor and their
> banks.

To address the issue, PokerStars modified its software so, where

possible, a consistent phony descriptor would appear on the bank

statements of a given U.S. customer.

36. Scheinberg, Bitar, Beckley, Burtnick, and Tate,

worked with multiple e-check processors introduced to them by

defendants Lang, Franzen, and others, many of which the Poker

Companies used simultaneously. These e-check providers included

the following:

a. <u>Intabill</u>. In or around the spring of 2007, Lang

introduced Scheinberg, Bitar, and Beckley to a method of e-check

processing offered by Intabill, an Australia-based payment

processing company. Because Intabill did not have direct access

to United States ACH processing accounts, Intabill "sub-

contracted" its processing to various United States-based e-check

processors. With the knowledge and approval of Scheinberg,

Bitar, Beckley, Burtnick and Tate, Intabill disguised the

gambling transactions as the transactions of dozens of phony

financial services merchants. Intabill processed at least

$543,210,092 of transactions for the Poker Companies from mid-

2007 through March 2009. In or around March 2009, the Poker

Companies ceased processing through Intabill, in part because

22

Intabill owed them tens of millions of dollars for past
processing.

b.    Chad Elie.   In 2008 and 2009, Elie had worked with
Intabill to establish processing accounts for internet gambling
that were disguised as accounts set up to process repayments of
so-called "payday loans," which were high-interest, high-risk
loans unrelated to gambling transactions.   In or about August and
September 2009, working with Franzen, Elie processed transactions
on behalf of Full Tilt Poker.   Also in or about August and
September 2009, working with Beckley, Elie processed transactions
on behalf of Absolute Poker through a bank account at Fifth Third
Bank that Elie told the bank was an account to be used for
internet marketing transactions.   Elie's deceptive processing
through Fifth Third Bank terminated in September 2009 when the
bank froze the funds, which were subsequently seized by U.S. law
enforcement through a judicial warrant.

c.    Intabill's U.S. Representative.   In or around
March 2009, Intabill's former U.S.-based representative, Andrew
Thornhill, began seeking to process transactions for the Poker
Companies himself, communicating at various times with
Scheinberg, Tate, Franzen, and Elie, among others, about
potential processing.   In or around June 2009, Thornhill and
Franzen began processing e-checks for each of the Poker Companies
disguised as payments to the phony "Green2YourGreen"

23

environmentally friendly household products company described in paragraph 25(b) of this Complaint. The Green2YourGreen processing lasted only a few months, until approximately August 2009, when Citibank and Wells Fargo Bank, among others, discovered that the transactions were, in fact, for internet gambling and terminated the accounts. At that time, the proceeds of these accounts were then seized by U.S. law enforcement pursuant to a judicial warrant.

d.   The Arizona Processor. In or around December 2008, after learning that Intabill was unlikely to continue processing, Scheinberg, Bitar, Beckley, Burtnick and Tate began processing payments through an Arizona payment processor (the "Arizona Processor"), which was assisted at times by a company operated by Lang. From in or about December 2008 through on or about June 1, 2009, the Arizona Processor processed more than $100 million in payments primarily from U.S. gamblers to each of the Poker Companies; all of these transactions were processed using the names of phony merchants so as falsely to appear unrelated to internet gambling. On or about June 1, 2009, the Arizona Processor ceased processing transactions for the Poker Companies following the seizure of its bank accounts by U.S. law enforcement pursuant to a judicial warrant.

e.   Ira Rubin. At various times relevant to this Complaint, each of the Poker Companies employed Rubin, his

24

company E-Triton, and various of Rubin's associates, including an

e-check processor in California (the "California Processor"), to

process their internet gambling transactions disguised as

legitimate online merchant transactions, in order to trick U.S.

banks into authorizing the transactions.  For example, in or

about mid-2008, Scheinberg and Burtnick hired Rubin's company E-

Triton to process PokerStars transactions disguised as payments

to dozens of phony web stores, including oneshopcenter.com and

mygolflocation.com, which Rubin sub-contracted to the Arizona

Processor.  In another example, in or about June 2009, following

the Arizona Processor's termination of its processing activities,

Burtnick and Franzen arranged for two of Rubin's associates to

process payments for Full Tilt Poker disguised as payments to a

medical billing company, until accounts related to that

processing were seized by judicial order in or about September

2009.  In a final example, at various times from approximately

2008 up to and including in or about March 2011, Beckley hired

Rubin to process e-checks for Absolute Poker disguised as, among

other things, payroll processing, affiliate marketing, and online

electronics merchants.

### "Transparent Processing"

37.  In or around late 2009, following the collapse of

multiple e-check processing operations used by the Poker

Companies and the judicially ordered seizure of funds, Scheinberg

and Bitar, begin exploring a new payment processing strategy –
so-called "transparent processing" – and directed the heads of
their payment processing departments, Tate and Burtnick, to find,
at least where possible, processing solutions that did not
involve lies to banks.  Despite their expressed desire for
"transparent" processing, PokerStars and Full Tilt Poker
continued to rely on processors who disguised the poker
transactions.

38.   In order to find "transparent" processors,
Scheinberg, Bitar, Burtnick and Tate, turned to processors who
had worked with the Poker Companies before, including defendants
Ryan Lang, Bradley Franzen, and Chad Elie.  The Poker Companies
had previously sued Elie for allegedly stealing $4 million of the
Poker Companies' money.  Elie was accepted as a source for
"transparent" processing following a conversation between Elie
and Scheinberg in or about the fall of 2009 in which Elie agree
to repay some of this money.

39.   Because it was illegal to process their internet
gambling transactions, the Poker Companies had difficulty in
identifying "transparent" processors.  Elie and his associates
were, however, able to persuade the principals of certain small,
local banks that were facing financial difficulties to engage in
such processing.  In exchange for this agreement to process
gambling transactions, the banks received sizeable fee income

26

from processing poker transactions as well as promises of multi-

million dollar investments in the banks from Elie and his

associates.  In at least one case, a payment to a bank official

who approved the processing was made as well.

40.  For example, in or around September 2009, Elie,

together with Andrew Thornhill and a partner of Elie's ("Elie's

Partner") approached Campos, the defendant, the Vice Chairman of

the Board and part-owner of SunFirst Bank, a small, private bank

based in Saint George, Utah.  Campos, while expressing

"trepidations" about gambling processing, proposed in a September

23, 2009 e-mail to accept such processing in return for a $10

million investment in SunFirst by Elie and Elie's Partner, which

would give Elie and Elie's Partner more than 30% ownership of the

bank.  Elie and Elie's Partner made an initial investment in

SunFirst Bank of approximately $3.4 million in approximately

December 2009.  On or about November 29, 2009, Andrew Thornhill

told an associate "things are going well with the bank we

purchased in Utah and my colleagues and I are looking to purchase

another bank for the purpose of repeating our business plan.  We

probably could do this for a grand total of 3 or 4 banks."

41.  On or about December 14, 2009, SunFirst Bank began

processing payments for Pokerstars and FullTilt Poker.  On or

about April 8, 2010, Campos, the defendant, sent an "invoice" to

Elie's Partner requesting that $20,000 be paid to a corporate

entity that Campos controlled as a "bonus" for "Check and Credit
Card Processing Consulting." SunFirst Bank processed over $200
million of payments for PokerStars and Full Tilt Poker through on
or about November 9, 2010, when, at the direction of the FDIC, it
ceased third party payment processing. SunFirst Bank earned
approximately $1.6 million in fees for this processing.

42.   In furtherance of the conspiracy described above
and to effect the illegal object thereof, Scheinberg, Bitar, Tom,
Beckley, Burtnick, Tate, Lang, Franzen, Rubin, Elie, and Campos,
and others known and unknown, committed the following overt acts,
among others, in the Southern District of New York and elsewhere:

a.   On or about October 20, 2008, Lang sent an e-
mail to principals of Intabill, reminding them that Burtnick would
soon leave PokerStars and that they had promised to "kick him
back" 5 cents for every dollar on Intabill's processing revenue
from PokerStars.

b.   On or about January 20, 2009, PokerStars, Full
Tilt Poker, and Absolute Poker each received an electronic
transfer of funds from a gambler located in the Southern District
of New York.

c.   On or about February 11, 2009, Beckley sent an
e-mail to a co-conspirator not named as a defendant herein
requesting that the co-conspirator obtain e-check and credit card
processing for Absolute Poker.

28

d.     On or about April 2, 2009, Scheinberg sent an
e-mail to a co-conspirator not named as a defendant in the
Indictment about a PokerStars processing account shut down by a
United States bank.

e.     On or about April 3, 2009, Lang, Burtnick, and
Bitar met in Nevada with a co-conspirator not named as a defendant
in the Indictment about processing payments through tribal banks.

f.     On or about June 4, 2009, Franzen sent an e-
mail to a co-conspirator not named as a defendant in the
Indictment and asked for a "payout company ID" for Full Tilt Poker
consisting of "something on the shelf with a basic web presence."

g.     On or about June 23, 2009, an unidentified
individual at Full Tilt Poker sent an e-mail to Franzen that
included comments on a call center script used by a payment
processor that discussed the importance of not mentioning online
poker to anyone calling customer service about a charge on a bank
statement.

h.     On or about September 22, 2009, Elie forwarded
to Beckley and Franzen an e-mail from a bank representative
stating that funds in an account opened by Elie for processing
internet marketing payments were being frozen by the bank as
gambling funds.

i.     On or about September 29, 2009, Campos sent an
e-mail to an attorney in which Campos called the attorney a "wet

29

blanket" for cautioning Campos about processing gambling payments.

j.    On or about October 15, 2009, Rubin sent an e-mail to Tate about processing PokerStars transactions through a Bank of America account opened in the name of a supposed internet shop selling electronics and other items.

k.    On or about July 20, 2010, Campos flew from New York to Ireland to a meeting regarding processing of poker transactions.

l.    In or around August 2007, Full Tilt Poker processed credit card payments for gambling transactions under the name "PS3SHOP," using a non-gambling credit card code for the transactions, through a credit card network with headquarters in the Southern District of New York.

### The Poker Company Domain Names

43.    The Poker Companies utilized websites as on-line portals for players to deposit and withdraw money to play online poker, and to actually play online poker.  In relation to these websites, the Poker Companies utilized the following domains:

POKERSTARS.COM,

FULLTILTPOKER.COM,

ABSOLUTEPOKER.COM,

ULTIMATEBET.COM, and

UB.COM

(the "Subject Domain Names").

30

44.   Domain names operate as follows:

a.   A domain name is a simple, easy-to-remember way for people to identify computers on the Internet.   For example, "www.google.com" and "www.yahoo.com" are domain names.

b.   The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.   Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."   The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right.   The right-most label conveys the "top-level" domain.   For example, the domain name "www.example.com" means that the computer assigned that name is in the ".com" top-level domain and the "example" second-level domain, and is a web server (denoted by the "www").

c.   DNS servers are computers connected to the Internet that convert domain names that are easy for people to remember into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet.   An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).   Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source

31

to its destination.  DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

      d.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For example, the registry for the ".tv," ".net," and ".com" top-level domains is VeriSign, Inc.

      e.   If an individual or business wants to purchase a domain name, they buy it through a company called a "registrar." Network Solutions LLC ("Network Solutions") and GoDaddy.com Inc. ("GoDaddy") are two well-known examples of registrars, although there are hundreds of registrars on the Internet.  The registrar, in turn, communicates this purchase to the relevant registry.  The individual or business who purchases, or registers, a domain name is called a "registrant."

      f.   Registrants control the IP address, and thus the computer, to which the domain name resolves.  Thus, a registrant may easily move a domain name to another computer anywhere in the world simply by changing the IP address at the registry.

      g.   Registries and/or registrars maintain additional information about domain names, including the name and contact information of the registrant.

32

44.  On March 5, 2011, a federal law enforcement agent visited the sites affiliated with the Subject Domain Names and took numerous "screen shots" of the sites, capturing what the websites looked like to one visiting the site on the Internet at that time.  Additionally, during the course of this investigation, an individual cooperating with law enforcement (the "CW") visited three of the websites discussed herein.  As detailed below for each of these three websites, the CW, through the websites, deposited real money into accounts maintained by the Poker Companies for playing poker online with real-money bets and withdrew money as well.

### THE POKERSTARS.COM WEBSITE

#### Content of the Pokerstars.com Website

45.  Pokerstars.com is an online platform for playing poker with real-money bets.  The site consists of numerous webpages that feature information relating to playing poker through the website, including for "Real Money."  As captured by the March 5, 2011 screen shots, the homepage states:  "Welcome to the World's Largest Poker Site."  It states there is a $600 "First Deposit Bonus" available to visitors of the site.  The homepage includes tabs which can be pressed to link to other pages within the site, including links entitled "Real Money" and "Poker Tournaments."  There is also tab for downloading Poker software. Lower on the homepage, it states:  "Welcome to PokerStars, where

you'll find more tournaments and games than any other poker site,
with 24/7 support, secure deposits, fast cashouts and award-
winning software.  This is where champions are born and you could
be next.  Start playing for free now."  Under a section entitled
"Pokerstars Blog News," it states that an individual with a
particular username won "$671,093.81 & Lamborghini."

46.  From this homepage, a visitor can link to another
webpage within the site that contains general information "About
PokerStars."  On that page, it states: "Making a deposit in to
your PokerStars account is also quick and easy, with a range of
payment options available."  You can also take advantage of fast
cashouts if you decide to withdraw money from your bank roll."
That page also contains a section entitled "Fully licensed and
regulated."  Under that section, the page reads, in part:
"PokerStars is a licensed and registered legal business located on
the Isle of Man in the British isles, and abides by all laws and
regulations where it does business."

47.  From the homepage, a visitor can also link to
another page within the site that deals with "Playing with Real
Money."  This page states, in part:

> Ready to play poker with real money at
> PokerStars? Download [indicating a link]
> our exciting online poker software and
> you'll be playing at our fast-paced
> tables in no time!

48.   This page also explains that "Real money deposits into your poker account are accepted in several ways," and provides a drop-down menu list of countries "to view a list of payment and cashout methods available."  The United States is included on that list.  This page states:

> PokerStars players' poker money and account balances are held in segregated accounts and not used for any of PokerStars' operational expenses.  These segregated accounts are managed by a leading European Bank.

49.   The page also lists a number of poker games and tournaments "available for real money play at PokerStars[.]" These include: Texas Holdem, Omaha High Low, Omaha High, Seven Card Stud High Low, Seven Card Stud, Razz, HORSE/HOSE, and a reference to Tournaments.

50.   This page also includes a section on "Cashing Out Your Poker Winnings."  That portion explains: "To cash out, click on the 'Cashier' button in the lobby and then select the 'Cash Out' button.  You will then be prompted for a cashout amount; please enter the amount and click 'Submit.'"  The page contains information stating that a player can play without depositing real money at a "play money table."

51.   Screen shots were also taken of a page within the website that explains how to "Fund Your Account."  "Step 1" explains that a visitor should "Log into your PokerStars account and click the 'Cashier' button located at the bottom left hand

35

corner of your game lobby."   "Step 2" then directs the visitor to
"Click 'Buy Chips' and choose a funding option, and click
'Deposit.'"   The listed deposit options include Instant eChecks,
and links to credit cards such as Visa and Diners Club
International.

### Gambling Deposits and Withdrawals on Pokerstars.com

52.   On or about the dates listed in the chart below,
the CW made the following deposits to a PokerStars online gambling
account through the pokerstars.com website from a bank account
held in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 06/10/10 | eCheck | $10.00 | $ 10.00 |
| 8/7/10 | Check21 | $150.00 | $150.00 |
| 9/13/10 | Check21 | $20.00 | $ 20.00 |
| 1/23/11 | ACH | $23.00 | Reversed/Not Processed |

53.   On or about the dates listed in the chart below,
the CW requested withdrawals from a PokerStars online gambling
account through the pokerstars.com website:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 8/4/2010 | Paper Check | $35.00 | $35.00 |
| 8/19/2010 | Paper Check | $100.00 | $100.00 |
| 11/29/2010 | Paper Check | $25.00 | $25.00 |

36

54. Rather than being issued from accounts in the name of PokerStars, the checks were issued from accounts in the names of entities with no seeming connection to gambling. For example, the checks issued on August 4, 2010 and August 19, 2010 came from an account in the name of TLC Global. The November 29, 2011 check came from an account in the name of Lancore Merchant Services.

### The Pokerstars.com Domain

55. In regard to pokerstars.com, registration for this domain was most recently updated on or about March 14, 2011, reflecting the registrar Nom IQ LTD (D.B.A. Com Laude), located in the United Kingdom. Approximately twenty-seven foreign language sites are affiliated with pokerstars.com. Most of these are simply pages within the website affiliated with the pokerstars.com domain, such as "pokerstars.com/de/," "pokerstars.com/gr/," and "pokerstars.com/it/." These pages are accessible to visitors in the United States.

56. PokerStars also operates several foreign-language affiliate websites that are not part of the pokerstars.com domain, such as "pokerstars.ee," "pokerstars.es," and "pokerstars.si."

### THE FULLTILT.COM WEBSITE

### Content of the Fulltilt.com Website

57. Similar to the pokerstars.com website, the fulltilt.com website is an online platform for playing poker with real-money bets. It consists of numerous webpages that feature information relating to playing poker through the website,

37

including for "Real Money." At the time of the screen shot, the
homepage indicated that 109,664 players were presently on line,
with 34,255 active tables, and 4,619 tournaments. The homepage
also advertised a "100% First Deposit Bonus," explaining: "Make
you first deposit at Full Tilt Poker and we'll automatically match
your initial deposit with a 100% bonus up to $600!". A link was
also included to play free poker. The homepage announced:
"Online poker at the Fastest Growing Online Poker Room." It
stated:

> Full Tilt Poker offers the best in <u>online
> poker</u> [indicating link]: world famous pros, a
> huge bonus, real or play money. <u>Play poker
> online</u> [indicating link] now, it's free to
> download. Try our free online poker game 24
> hours a day on state-of-the-art online poker
> software. Play for real money or for free in
> tournaments or ring games. Full Tilt Poker's
> online poker room was designed by world class
> poker professionals, and offers you the
> ability to learn, chat, and <u>play online poker</u>
> [indicating link] with the pros.
>
> Full Tilt Poker offers a wide variety of
> online poker games including No Limit Texas
> Holdem, Pot Limit Texas Hold Em, and Fixed
> Limit Texas Holdem [sic] as well as varieties
> of Omaha, Stud, and Razz. We have ring games,
> Sit and Go tournaments, and multi-table
> tournaments. If you can find it in a poker
> room, you can probably find it at Full Tilt
> Poker.

58. One of the pages within the Full Tilt website deals
with "Playing For Real Money[.]" This page states:

> If you're looking to get the most out of your
> online poker experience, Full Tilt Poker
> offers a wide selection of real money ring

38

> games and tournaments for your enjoyment.
> What's more, Full Tilt Poker works hard to
> ensure that playing for real money is easy,
> safe and secure by:

> • Providing a variety of safe and secure
>   payment processors [indicating link] to
>   make depositing money fast and easy.

> • Ensuring any money you have on deposit
>   with Full Tilt Poker is completely safe
>   and secure [indicating link].

> • Protecting your valuable personal
>   information [indicating link].

> • Processing withdrawals [indicating link]
>   quickly and efficiently.

59.   This page also explains to visitors how to make their first deposit.  This page goes on to state:

> Every time you play for real money you'll
> earn Full Tilt Poker points [indicating
> link] that can be redeemed for tournament
> entries and exclusive Full Tilt Poker
> gear [indicating link].  You can earn
> Full Tilt Poker points by playing in any
> of our raked [indicating link] real money
> ring games or tournaments . . . .

60.   Another page within the site deals with depositing "real money."  This page lists Quick Deposit, credit cards, and cash transfers as methods by which a visitor could deposit real money into their Full Tilt Poker account.

61.   On another page within the website, which deals with "Security," it states:

> Full Tilt Poker conducts their banking and
> financial affairs in accordance with generally
> accepted standards of internationally
> recognized banking institutions.  Full Tilt

39

> Poker follows and adheres to applicable laws
> pertaining to transaction reporting and anti-
> money laundering laws and regulations.

62.  The website also includes a page entitled End User
License Agreement.  That page sets out Terms and Conditions
pertaining to "persons situated in North America" in regard to the
website accessible from the domain name "www.FullTiltPoker.com."
It states that the terms and conditions on this page constitute a
binding agreement between the website visitor and the corporate
entity Vantage Limited, which is registered Alderney in the
Channel Islands.  This page states that:

> Adult users of all skill levels who are
> situated in North America can download the
> proprietary gaming software needed to
> participate in poker tournaments and to play
> online interactive games of poker for real
> money at www.FullTiltPoker.com.

63.  The website also includes a page explaining to
players how they can withdraw funds from their Full Tilt Poker
accounts.  This page states that "[a]t Full Tilt Poker, we believe
our players should be able to withdraw funds from their accounts
as easily as they can make deposits."  It then lists the steps for
players to execute a withdrawal.  These steps consist generally of
logging on to the website, clicking the "Cashier" button, clicking
on the "Withdrawal" button, selecting a withdrawal method,
entering the amount you wish to withdrawal along with other
required account information, confirming that amount and account

information, and clicking the "Submit" button.  A player can also choose withdrawal by check as a withdrawal option.

Gambling Deposits and Withdrawals on Fulltilt.com

64.  On or about the dates listed in the chart below, the CW made deposits to a Full Tilt online gambling account through the Fulltilt.com website, with the funds coming out of the CW's bank account in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/30/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | eCheck | $ 30.00 | $ 30.00 |
| 3/31/10 | Visa | $100.00 | $ 100.00 |
| 4/09/10 | Visa | $ 30.00 | $ 30.00 |
| 4/23/10 | eCheck | $ 30.00 | $ 30.00 |
| 4/27/10 | eCheck | $ 20.00 | $ 20.00 |
| 4/28/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 20.00 | $ 20.00 |
| 5/6/10 | eCheck | $ 30.00 | $ 30.00 |
| 5/7/10 | eCheck | $ 11.00 | $ 11.00 |
| 5/11/10 | visa | $ 12.00 | $ 12.00 |
| 5/12/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/12/10 | eCheck | $ 25.00 | $ 25.00 |
| 5/13/10 | visa | $ 12.00 | $ 12.00 |
| 5/18/10 | eCheck | $ 18.00 | $ 18.00 |
| 5/26/10 | eCheck | $ 21.00 | $ 21.00 |
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |

41

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 5/27/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/2/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/2/10 | eCheck | $ 17.00 | $ 17.00 |
| 6/10/10 | eCheck | $ 20.00 | $ 20.00 |
| 6/11/10 | eCheck | $ 11.00 | $ 11.00 |
| 6/14/10 | eCheck | $ 10.00 | $ 10.00 |
| 6/16/10 | eCheck | $ 14.00 | $ 14.00 |
| 6/17/10 | eCheck | $ 50.00 | $ 50.00 |
| 6/24/10 | eCheck | $ 32.00 | $ 32.00 |
| 6/28/10 | eCheck | $ 28.00 | $ 28.00 |
| 6/29/10 | eCheck | $ 22.00 | $ 22.00 |
| 6/29/10 | eCheck | $ 34.00 | $ 34.00 |
| 6/30/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/1/10 | eCheck | $ 47.00 | $ 47.00 |
| 7/2/10 | eCheck | $ 20.00 | $ 20.00 |
| 7/9/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/13/10 | eCheck | $ 10.00 | $ 10.00 |
| 7/13/10 | eCheck | $ 12.00 | $ 12.00 |
| 7/19/10 | eCheck | $ 14.00 | $ 14.00 |
| 7/23/10 | eCheck | $ 22.00 | $ 22.00 |
| 7/26/10 | eCheck | $ 11.00 | $ 11.00 |
| 7/26/10 | eCheck | $ 14.00 | $ 14.00 |
| 7/27/10 | eCheck | $ 21.00 | $ 21.00 |
| 7/28/10 | eCheck | $ 75.00 | $ 75.00 |
| 7/30/10 | Western Union | $ 105.00 | $105.00 |
| 8/3/10 | eCheck | $ 50.00 | $ 50.00 |

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 8/16/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/2/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/15/10 | eCheck | $ 11.00 | $ 11.00 |
| 9/21/10 | eCheck | $ 12.00 | $ 12.00 |
| 9/30/10 | eCheck | $ 11.00 | $ 11.00 |
| 10/14/10 | eCheck | $ 90.00 | $ 89.00 |
| 11/3/10 | eCheck | $ 45.00 | $ 45.00 |
| 11/15/10 | eCheck | $ 12.00 | $ 12.00 |
| 1/14/11 | ACH | $ 14.00 | Not Processed |
| 1/15/11 | ACH | $ 16.00 | Not Processed |
| 1/21/11 | ACH | $ 48.00 | Not Processed |
| 1/24/11 | ACH | $ 51.00 | Not Processed |
| 1/27/11 | ACH | $ 11.00 | Not Processed |
| 1/29/11 | ACH | $ 46.00 | Not Processed |
| 2/1/11 | ACH | $ 43.00 | Not Processed |
| 2/2/11 | ACH | $ 53.00 | Not Processed |
| 2/4/11 | ACH | $ 24.00 | Not Processed |
| 2/8/11 | ACH | $ 52.40 | Not Processed |
| 2/9/11 | ACH | $ 32.00 | Not Processed |
| 2/10/11 | ACH | $ 32.00 | Not Processed |
| 2/14/11 | ACH | $ 59.00 | Not Processed |
| 2/15/11 | ACH | $ 81.00 | Not Processed |
| 2/16/11 | ACH | $ 53.00 | Not Processed |
| 2/20/11 | ACH | $ 12.00 | Not Processed |
| 2/22/11 | ACH | $ 57.00 | Not Processed |
| 2/22/11 | ACH | $ 89.00 | Not Processed |
| 2/23/11 | ACH | $ 87.00 | Not Processed |

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 2/24/11 | ACH | $ 56.00 | Not Processed |
| 2/25/11 | ACH | $ 61.00 | Not Processed |
| 3/2/11 | ACH | $ 45.00 | Not Processed |
| 3/2/11 | ACH | $ 71.00 | Not Processed |
| 3/7/11 | ACH | $ 33.00 | Not Processed |
| 3/7/11 | ACH | $ 81.00 | Not Processed |
| 3/8/11 | ACH | $ 57.00 | Not Processed |
| 3/9/11 | ACH | $ 53.00 | Not Processed |
| 3/10/11 | ACH | $ 76.00 | Not Processed |
| 3/10/11 | ACH | $ 34.00 | Not Processed |
| 3/11/11 | ACH | $ 78.00 | Not Processed |

65.   On or about the dates listed in the chart below, the CW requested withdrawals from a Full Tilt online gambling account through the fulltilt.com website.  Automated credits and wire transfers were credited to the CW's bank account in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/30/10 | Automated Credit | $100.00 | $100.00 |
| 6/10/10 | Paper Check | $100.00 | $100.00 |
| 6/28/10 | Automated Credit | $120.00 | $120.00 |
| 7/28/10 | Automated Credit | $100.00 | $100.00 |
| 8/2/10 | Paper Check | $100.00 | $100.20 |
| 1/21/11 | Automated Credit; Converted to Wire Transfer | $100.00 | $ 72.08 |
| 2/3/11 | Paper Check | $100.00 | $100.17 |

44

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 2/15/11 | Paper Check | $101.00 | $101.22 |
| 2/22/11 | Paper Check | $107.00 | $107.29 |
| 2/25/11 | Paper Check | $102.00 | $102.16 |
| 3/12/11 | Paper Check | $101.00 | $101.15 |
| 3/12/11 | Automated Credit | $102.63 | Pending |

66. Rather than being issued from accounts in the name of Full Tilt, the payments were issued from accounts in the names of entities with no seeming connection to gambling. For example, the checks issued on June 10, 2010 came from an account in the name of Arrow Checks. The check issued on August 2, 2010 came from an account in the name of TLC Global. The check issued on February 3, 2011 came from an account in the name of Eastern Expressions Inc. The checks issued on February 14, 18, 23, and 28, 2011 were all in the name of Shared Expressions, Inc.

### The Fulltiltpoker.com Domain

67. In regard to fulltiltpoker.com, registration for this domain was most recently updated on or about September 23, 2008, indicating the registrar Safenames Ltd., with an address in the United Kingdom. Approximately twenty-one foreign lanaguage sites are affiliated with fulltiltpoker.com. Most of these are simply pages within the website affiliated with the fulltiltpoker.com such as "fulltiltpoker.com/ar/,"

45

"fulltiltpoker.com/cn/," and "fulltiltpoker.com/cs/." These pages
are accessible to visitors in the United States.

      68.   Full Tilt operates at least two foreign-language
affiliate websites, such as "fulltiltpoker.fr," and
"www5.fulltiltpokeritaly.co.it/it/," that are not part of the
fulltiltpoker.com domain.

THE ABSOLUTEPOKER.COM WEBSITE

Content of the Absolutepoker.com Website

      69.   Similar to the Poker Stars and Full Tilt Poker
websites, the absolutepoker.com website is an online platform for
playing poker with real-money bets. It consists of numerous
webpages that feature information relating to playing poker
through the website, including for real money. The homepage for
this site states: "PLAY POKER WITH A PAYOFF!" It states that
players can get, among other things, "Up to $500 for free," or a
"Free Seat in a $1,000 Tournament." At the time of the screen
shot, the homepage indicated that there were 15,454 players online
playing at 2,377 live tables. The homepage also states:

> Over the past ten years, millions of people
> have taken to our tables, playing online poker
> games for free. In fact, if there's one thing
> free online poker players and real money
> sharks agree on, it's that Absolute Poker is
> the best place to play poker online. Take a
> seat at one of our free online poker games or
> real money poker tables and start enjoying
> poker at one of the world's leading sites.
>
> From free online poker games to real money
> poker tournaments, we'll always make playing
> poker online with us worth your while. We

46

offer a huge selection of online poker games
with stakes to suit your budget. Not to
mention, we offer some of the best deposit
bonuses and poker rewards in the business. So
what are you waiting for? Download Absolute
Poker's free software and start playing online
with us. You could soon be on your way to
winning big games and huge tournament cash
prizes.

70.   The site also has a page dealing with "Online
banking at Absolute Poker." The page explains:

With more real poker money payment options
than any other poker room, it's no wonder
players from across the globe deposit their
poker money with Absolute Poker! Our
unrivaled selection of convenient deposit
options and fast poker money withdrawal
methods make it easy to fund your bankroll and
take your winnings to the bank. When it comes
to online real money poker sites, Absolute
Poker gives you the most options to manage
your poker money!

71.   Another page within the site that deals with
depositing money into Absolute Poker account includes this
unattributed quote: "Nothing beats the thrill of a real money
game. Fund your account today using any one of the following
secure banking options." The options listed on the page include
utilizing credit cards, Fast Bank Transfer Service, and a variety
of other methods.

72.   Another page within the site offers guidance to
players for withdrawing their money from the site. That page
contains the following unattributed quote: "You took it down. You
owned the table. You won the pot. Now, it's time to collect. We
pride ourselves on superfast payouts at Absolute Poker. If you've

47

won it - and you want it - it's already on its way." This page
lists a number of withdrawal methods specifically for U.S. poker
players, including, among others, bank transfers, checks by mail,
and checks by courier.

Gambling Deposits and Withdrawals on Absolutepoker.com

73.   On or about the dates listed in the chart below,
the CW made the following deposits to an Absolute Poker online
gambling account through the absolutepoker.com website from the
CW's bank account held in Manhattan, New York:

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/25/10 | eCheck | $ 50.00 | $ 50.00 |
| 3/26/10 | Visa | $ 20.00 | $ 19.99 |
| 6/10/10 | Visa | $ 10.00 | $  9.94 |
| 6/14/10 | eCheck | $ 50.00 | $ 50.00 |
| 6/18/10 | Visa | $ 30.00 | $ 29.99 |
| 7/28/10 | eCheck | $100.00 | $100.00 |
| 10/14/10 | Visa | $ 10.00 | $  9.98 |
| 12/27/10 | Visa | $ 12.00 | $ 11.97 |
| 1/4/11 | eCheck | $ 50.00 | $ 49.97 |
| 2/17/11 | ACH | $ 77.00 | $ 76.96 |
| 3/28/11 | ACH | $ 51.00 | $ 50.99 |

74.   On or about the dates listed in the chart below,
the CW requested withdrawals from an Absolute Poker online
gambling account through the absolutepoker.com website, with the
funds credited to the CW's bank account in Manhattan, New York:

48

| Date | Method of Payment | Amount Requested | Amount Reported |
|------|-------------------|------------------|-----------------|
| 3/25/10 | Automated Credit | $   1.00 | $   0.01 |
| 3/25/10 | Automated Credit | $   1.00 | $   0.02 |
| 8/5/10 | Automated Credit | $100.00 | $100.00 |
| 3/28/11 | Automated Credit | $106.00 | $106.00 |

75.   Rather than being issued from accounts in the name
of Absolute Poker, credits issued were through entities with no
apparent connection to gambling.

### The Absolutepoker.com Domain

76.   In regard to the absolutepoker.com domain,
Registration for this domain was updated on March 3, 2009,
indicating the registrar Nom IQ LTD (D.B.A. Com Laude), located in
the United Kingdom.  Absolutepoker.com has approximately two
third-level domain names affiliated with it, both of which are
foreign language sites.  A "third-level domain name" is a domain
name with subdomain labels to the left of the domain name
"absolutepoker.com," such as "de.absolutepoker.com" and
"sv.absolutepoker.com."  The web sites with these third-level
domain names are accessible to visitors in the United States.

### THE ULTIMATEBET.COM WEBSITE

### Content of the Ultimate Bet Website, UB.com

77.   As explained in the Indictment, ultimatebet.com is
owned and controlled by the same entity controlling

49

absolutepoker.com.  (Ind. ¶ 6).  When attempting to visit
ultimatebet.com, a federal law enforcement agent was instantly
redirected to ub.com.  Like the absolutepoker.com site, the ub.com
site indicates that it is controlled by "Mohawk Internet
Technologies."  The homepage for ub.com contains statements such
as "Raise.Stack.Own," "Feed Your Poker Passion," and "Play & Win.
We're open to everyone including US players!".  At the time of the
screenshot, the homepage noted that 15,414 players were online.
The homepage states:

> If you enjoy playing poker, you'll love the incredible
> selection of online poker games offered at UB.  Formerly
> UltimateBet.com, UB offers the best free online poker
> games and real money poker games available on the web.
> So, whether you're an experienced online poker sites
> player or new to the game, you'll love the excitement of
> playing poker online at our tables.  The new UB also
> features a wide range of online poker stakes and a
> fantastic poker community.  Meet new people and play the
> best free online poker games at UB.  You'll soon see why
> so many people say we're the best of the poker sites.

78.  The homepage also provides information on making
deposits at the ub.com site.  It explains:

> Loading your online poker account at UB is
> simple, safe and secure.  To protect your
> funds, we're proud to offer our customers top-
> of-the-line encryption on all transactions.
> Download UB's free online poker software and
> select from our wide variety of deposit
> options.  Note: For players in the United
> States, we recommend Visa card and bank
> transfer deposits . . .

50

79.   Under a section on the homepage entitled "The
Ultimate Trust," the homepage states "We've been offering poker
online for over ten years and are licensed in North America."

80.   A page within the ub.com site deals with making
deposits.  For players within the United States, the page
recommends deposit by Visa or MasterCard.  The page states:
"Poker: Real money deposits add up to big rewards at UB, one of
the world's most popular online cardrooms."  The page goes on to
explain:

> UB offers you more ways to deposit real money
> funds into your poker account than almost any
> other online real money poker room.  As a new
> player at UB, you'll receive an industry-
> leading 111% poker deposit bonus when you set
> up a free account for real money poker play
> with UB.  What's more our regular reload
> bonuses help take your poker winnings much
> further.

81.   A page within the site also deals with the
withdrawal of funds from the ub.com poker platform.  For players
in the United States, the page lists bank transfers, checks by
mail, checks by courier, and premium bank wires as withdrawal
methods.

## The Ultimatebet.com Domain

82.   In regard to ultimatebet.com, registration for this
domain name was most recently updated on or about October 19,
2009, indicating the registrar GoDaddy.com, Inc., located in
Arizona.

51

## The UB.com Domain

83.   I regard to ub.com, registration information for
this domain name was updated on or about November 5, 2009,
indicating the registrar Nom IQ LTD (D.B.A. Com Laude), located in
the United Kingdom.  Approximately three third-level domain names
are affiliated with ub.com, which are foreign language sites.  The
sites are accessible to visitors in the United States.  It also
has at least one foreign language site, "ub.de," that is not part
of the ub.com domain.

## Prior Seizures of Poker Processing Accounts

84.   G.I. Holdings.  On or about August 25, 2009, United
States Magistrate Judge Ronald L. Ellis, Southern District of New
York, issued warrants to seize accounts held in the name of G.I.
Holdings, a payment processor for the Poker Companies, based on
probable cause to believe that the funds were subject to seizure
and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and
(C), 981(b), 984, and 1955, 09 Mag. 1932.  A true and correct copy
of the Affidavit of FBI Special Agent Rebecca E. Vassilakos in
support of the seizure warrants is annexed hereto as Exhibit C and
incorporated by reference as if set forth fully herein.  Pursuant
to the seizure warrants, approximately $3,029,711.94 was seized
from account number 370117950 held at City National Bank in the
name of G.I. Holdings; approximately $2,057,620.28 was seized from
account number 5383346862 held at Wells Fargo Bank in the name of
G.I. Holdings; approximately $3,055,108.21 was seized from account

52

numbers 203023239 held at Citibank, N.A. in the name of G.I.

Holdings; approximately $784,160.95 was seized from account number

203118542 held at Citibank, N.A. in the name of G.I. Holdings;

approximately $1,000.00 was seized from account number 203118559

held at Citibank, N.A., in the name of G.I. Holdings;

approximately $925.00 was seized from account number 203118575

held at Citibank, N.A., in the name of G.I. Holdings;

approximately $124,178.72 was seized from account number

2020003792 held at Service 1st Bank of Nevada in the name of G.I.

Holdings; approximately $1,035,415.44 was seized from account

number 0021002712 held at Nevada Commerce Bank in the name of G.I.

Holdings; and approximately $122,308.78 was seized from account

number 0021002795 held at Nevada Commerce Bank in the name of G.I.

Holdings.

85. On or about August 31, 2009, United States

Magistrate Judge Michael H. Dolinger, Southern District of New

York, issued a warrant to seize an account held in the name of

G.I. Holdings based on probable cause to believe that the funds

were subject to seizure and civil forfeiture pursuant to 18 U.S.C.

§§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 1932. A

true and correct copy of the Affidavit of FBI Special Agent Dana

Conte in support of the seizure warrants is annexed hereto as

Exhibit D and incorporated by reference as if set forth fully

herein. Pursuant to the seizure warrant, approximately $231,000

53

was seized from account number 80000373283 held at First Republic
Bank in the name of G.I. Holdings.

86.  SNR, Inc.  On or about October 16, 2009, United
States Magistrate Judge Douglass F. Eaton, Southern District of
New York, issued warrants to seize accounts held in the names of
SNR, Inc., a payment processor for the Poker Companies, based on
probable cause to believe that the funds were subject to seizure
and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C),
981(b), 984, and 1955, 09 Mag. 2317.  A true and correct copy of
the Affidavit of FBI Special Agent Rebecca E. Vassilakos in
support of the warrants is annexed hereto as Exhibit E and
incorporated by reference as if set forth fully herein.  Pursuant
to the seizure warrants, approximately $30.27 was seized from
account number 01662184444 held at Huntington National Bank in the
name SNR, Inc.; approximately $1,057,797.29 was seized from
account number 01662184457 held at Huntington National Bank in the
name SNR, Inc.; approximately $649,261.20 was seized from account
number 01662191343 held at Huntington National Bank in the name of
SNR, Inc.; approximately $199,175.14 was seized from abbount
number 658049382 held at the Bank of West in the name of SNR,
Inc.; approximately $4,925.00 was seized from account number
0952071585 held at Bank of America in the name of SNR, Inc.;
approximately $25.00 was seized from account number 0952071603
held at Bank of America in the name of SNR, Inc.; approximately
$992,499.53 was seized from account number 203366638 held at

54

Citibank, N.A., in the name of SNR, Inc.; and approximately
$865,000.00 was seized from account number 0952071467 held at Bank
of America, N.A., in the name of SNR, Inc.

87. <u>Viable</u>. On or about October 26, 2009, United
States Magistrate Judge Frank Maas, Southern District of New York,
issued warrants to seize accounts held in the names of Viable
Marketing Corp. and EZO, LLC, payment processors for the Poker
Companies, based on probable cause to believe that the funds were
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§
981(a)(1)(A) and (C), 981(b), 984, and 1955, 09 Mag. 2382. A true
and correct copy of the Affidavit of FBI Special Agent Rebecca E.
Vassilakos in support of the seizure warrants is annexed hereto as
<u>Exhibit F</u> and incorporated by reference as if set forth fully
herein. Pursuant to the seizure warrants, approximately
$8,168,168.89 was seized from account number 7431859508 held at
Fifth Third Bank in the name of Viable Marketing Corp.;
approximately $40,960.86 was seized from account number 7432618069
held at Fifth Third Bank in the name of Viable Marketing Corp.;
approximately $376,706.19 was seized from account number
229006067857 held at Bank of America in the name of Viable
Marketing Corp.; and approximately $33,743.75 was seized from
account number 003678667131 held at Bank of America in the name of
EZO, LLC.

88. On or about February 19, 2010, United States
Magistrate Judge Kevin Nathaniel Fox, Southern District of New

York, issued a warrant to seize accounts held in the name of

Viable Processing Solutions, a payment process for the Poker

Companies, based on probable cause to believe that the funds were

subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§

981(a)(1)(A) and (C), 981(b), 984, and 1955, 10 Mag. 354. A true

and correct copy of the Affidavit of FBI Special Agent Dana Conte

in support of the seizure warrants is annexed hereto as Exhibit G

and incorporated by reference as if set forth fully herein.

89. LST Financial and Redfall. On or about July 19,

2010, United States Magistrate Judge Kevin Nathaniel Fox, Southern

District of New York, issued warrants to seize accounts held in

the names of LST Financial, ASP Consultants, LLC, Autoscribe

Corporation, and Axiom Foreign Exchange Intl, based on probable

cause to believe that the funds were subject to seizure and civil

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b),

984, and 1955, 10 Mag. 1562. A true and correct copy of the

Affidavit of FBI Special Agent Rosemary Karaka in support of the

seizure warrants is annexed hereto as Exhibit H and incorporated

by reference as if set forth fully herein. Pursuant to the

seizure warrants, approximately $447,196.79 was seized from

account number 804815470 held at JPMorgan Chase Bank in the name

of ASP Consultants, LLC; approximately $12,642.44 was seized from

account number 804815488 held at JPMorgan Chase Bank in the name

of ASP Consultants, LLC; approximately $4,472.58 was seized from

account number 822823779 held at JPMorgan Chase Bank in the name

of ASP Consultants, LLC; approximately $84.21 was seized from account number 822824025 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $6,047.84 was seized from account number 822824140 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; approximately $17,460.95 was seized from account number 1003245502 held at JPMorgan Chase Bank in the name of ASP Consultants, LLC; and approximately $8,018.04 was seized from account number 9105709543 held at Citibank, N.A. in the name of Autoscribe Corporation.

90. EPX and MAS, Inc. On or about December 1, 2010, United States Magistrate Judge Ronald L. Ellis, Southern District of New York, issued a warrant to seize $6,152,285.88 on deposit at First Bank of Delaware in account numbered 9016139; all funds on deposit at UMPQUA Bank in account number 972402309 held in the name of Ultra Safe Pay and all property traceable thereto, and all funds on deposit at Hawaii National Bank in account number 12008656 held in the name MAS Inc. and all property traceable thereto based on probable cause to believe that the funds were subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b), 984, and 1955, 10 Mag. 2701. A true and correct copy of the Affidavit of FBI Special Agent Rosemary Karaka in support of the seizure warrants is annexed hereto as Exhibit I and incorporated by reference as if set forth fully herein.

**V. PROBABLE CAUSE FOR FORFEITURE**

91.   As set forth above, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from United States gamblers.   Instead, the principals of the Poker Companies operated through various deceptive means designed to trick United States banks and financial institutions into processing gambling transactions on the Poker Companies' behalf.

### The Poker Companies

92.   As alleged above and in the Indictment, the Poker Companies are properties used in violation of Title 18, United States Code, Section 1955.   The Poker Companies and all or their assets are subject to forfeiture pursuant to Title 18, United States Code, Section 1955(d).

### The Poker Company Domain Names

93.   As alleged above and in the Indictment, the Poker Company Domain Names (the Subject Domain Names described above) are properties used in violation of Title 18, United States Code, Section 1955 and are properties involved in money laundering transactions.

58

### The Poker Company Accounts

94.   As alleged above and in the Indictment and as
described in the Karaka Declaration, the Poker Company Accounts[1]
are held in the names of the Defendants and corporate entities
controlled by the Defendants, and are used in violation of the
provisions of Title 18, United States Code, Section 1955.   (Ex. B
¶¶ 26-55).

95.   Further, as alleged above and in the Indictment and
as described in the Karaka Declaration, the Poker Company Accounts
contain funds traceable to illegal gambling businesses, bank
fraud, wire fraud, and money laundering.   (Ex. B ¶¶ 26-55).

### The Poker Processor Accounts

96.   As alleged above and in the Indictment and as
described in the exhibits attached hereto, the Poker Processor
Accounts[2] contain funds constituting or derived from proceeds
traceable to bank fraud and wire fraud, in violation of Title 18,
United States Code, Sections 1343 and 1344, and property involved
in transactions in violation of Title 18, United States Code,
Sections 1956 and 1957, and property traceable to such property.
(Ex. B ¶¶ 61-73).

---

[1]      Listed in Schedule A, incorporated by reference as if
fully set forth herein

[2]      Listed in Schedule B, incorporated by reference as if
fully set forth herein.

59

97.   In sum, there is probable cause to believe that the
Defendant Properties constitute (a) property used in illegal
gambling businesses, in violation of Title 18, United States Code,
Section 1955, and the proceeds of illegal gambling businesses; (b)
the proceeds of a conspiracy to commit wire fraud and bank fraud,
in violation of Title 18, United States Code, Sections 1343, 1344,
and 1349; and (c) property involved in a conspiracy to commit
money laundering in violation of Title 18, United States Code,
Section 1956(h).   Accordingly, the Defendant Properties are
subject to forfeiture to the United States of America pursuant to
Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C),
and 1955(d).

## VI.   CLAIMS FOR FORFEITURE

### FIRST CLAIM FOR RELIEF

**Forfeiture Under 18 U.S.C. §§ 1955(d) and 981(a)(1)(C) —**

**Illegal Gambling**

98.   Paragraphs 1 through 97 of this Complaint are
repeated and realleged as if fully set forth herein.

99.   Pursuant to 18 U.S.C. § 1955(d), "Any property,
including money, used in [an illegal gambling business] may be
seized and forfeited to the United States."

100. Additionally, Title 18, United States Code, §
981(a)(1)(C) subjects to forfeiture:

60

> Any property, real or personal, which
> constitutes or is derived from proceeds
> traceable to a violation of section . . . 1344
> of this title or any offense constituting
> 'specified unlawful activity' (as defined in
> section 1956(c)(7) of this title), or a
> conspiracy to commit such offense.

101. Title 18, United States Code, § 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ." Among the specified unlawful activity set forth in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1955.

102. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 1955(d) because they were used in violation of the provisions of 18 U.S.C. § 1955.

103. The Defendant Properties are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of conducting illegal gambling businesses.

## SECOND CLAIM FOR RELIEF

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C) - Bank and Wire Fraud**

104. Paragraphs 1 through 97 of this Complaint are repeated and realleged as if fully set forth herein.

105. Title 18, United States Code, § 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which
> constitutes or is derived from proceeds
> traceable to a violation of section . . . 1344
> of this title or any offense constituting
> 'specified unlawful activity' (as defined in

61

section 1956(c)(7) of this title), or a
conspiracy to commit such offense.

106. Title 18, United States Code, § 1956(c)(7) defines
the term "specified unlawful activity" to mean, in relevant part,
"any act or activity constituting an offense listed in section
1961(1) of this title. . . ." Among the specified unlawful
activity set forth in 18 U.S.C. § 1961(1) are 18 U.S.C. § 1343
(relating to wire fraud) and 18 U.S.C. § 1344 (relating to
financial institution fraud).

107. Title 18, United States Code, § 1349, provides that

Any person who attempts or conspires to commit
any offense under this chapter [including
Sections 1343 and 1344] shall be subject to
the same penalties as those prescribed for the
offense, the commission of which was the
object of the attempt or conspiracy.

108. Title 18, United States Code, § 1343, provides that

Whoever, having devised or intending to devise
any scheme or artifice to defraud, or for
obtaining money or property by means of false
or fraudulent pretenses, representations, or
promises, transmits or causes to be
transmitted by means of wire . . . in
interstate or foreign commerce, any writings,
signs, signals, pictures, or sounds for the
purpose of executing such scheme or artifice

shall be guilty of a crime.

109. Title 18, United States Code, Section 1344 provides
in relevant part that:

Whoever knowingly executes, or attempts to
execute, a scheme or artifice-

(1)  to defraud a financial institution; or

62

>            (2)   to obtain any of the moneys, funds,
>       credits, assets, securities, or other property
>       owned by, or under the custody or control of,
>       a financial institution, by means of false or
>       fraudulent pretenses, representations, or
>       promises;
>
>       shall be guilty of a crime.

110. From at least in or about 2006, up to and including on or about March 2011, in the Southern District of New York and elsewhere, Scheinberg, Bitar, Beckley, Burtnick, Tate, Ryan Lang, Bradley Franzen, Ira Rubin, and Elie, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, and wire fraud, in violation of Title 18, United States Code, Section 1343.

111. By reason of the above, the Defendant Properties are subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981, 1343, 1344 and 1349.

### THIRD CLAIM FOR RELIEF

**Forfeiture Under 18 U.S.C. § 981(a)(1)(A) - Money Laundering**

112. Paragraphs 1 through 97 of this Complaint are repeated and realleged as if fully set forth herein.

113. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money

laundering offenses], or any property traceable to such property,"
is subject to forfeiture.

114. Pursuant to Title 18, United States Code, Section
1956, commonly known as the "money laundering" statute, a crime is
committed by a person who:

> (a)(1) . . . knowing that the property
> involved in a financial transaction represents
> the proceeds of some form of unlawful
> activity, conducts or attempts to conduct such
> a financial transaction which in fact involves
> the proceeds of specified unlawful activity –
>
>> (A)(i) with the intent to promote
>> the carrying on of specified
>> unlawful activity; or
>>
>> (ii) with intent to engage in conduct
>> constituting a violation of section 7201
>> or 7206 of the Internal Revenue Code of
>> 1986; or
>>
>> (B) knowing that the transaction is
>> designed in whole or in part –
>>
>> (i) to conceal or disguise the nature,
>> the location, the source, the ownership,
>> or the control of the proceeds of
>> specified unlawful activity; or
>>
>> (ii) to avoid a transaction
>> reporting requirement under State or
>> Federal law,

shall be guilty of a crime.

115. Title 18, United States Code, Section 1956 further
provides, in pertinent part, that

> (a)(2) Whoever transports, transmits, or
> transfers, or attempts to transport, transmit,
> or transfer a monetary instrument or funds
> from a place in the United States to or
> through a place outside the United States or

> to a place in the United States from or
> through a place outside the United States –
>
>> (A) with the intent to promote the
>> carrying on of specified unlawful
>> activity . . . .

shall be guilty of a crime.

116. Title 18, United States Code, Section 1957 provides
that:  "Whoever, [with such offense under this section taking
place in the United States] knowingly engages or attempts to
engage in a monetary transaction in criminally derived property of
a value greater than $10,000 and is derived from specified
unlawful activity," shall guilty of a crime.

117. Title 18, United States Code, Section 1956 further
provides that "[a]ny person who conspires to commit any offense
defined in this section or section 1957 shall be subject to the
same penalties as those prescribed for the offense the commission
of which was the object of the conspiracy."

118. By reason of the above, the Defendant Properties
are subject to forfeiture pursuant to Title 18, United States
Code, Section 981(a)(1)(A).

### VII.   CIVIL MONEY LAUNDERING PENALTIES

### 18 U.S.C. § 1956

119. Paragraphs 1 through 97 of this Complaint are
repeated and realleged as if fully set forth herein.

120. Pursuant to Title 18, United States Code, Section
1956(b), "[w]hoever conducts or attempts to conduct a transaction

described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of — (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

121. Accordingly, the Defendant Entities are liable to the Government for a sum of money representing the amount of property, funds, or monetary instruments involved in the money laundering offenses described above, in an amount that is no less than $1.5 billion for the PokerStars Entities; $1 billion for the Full Tilt Poker Entities; and $500 million for the Absolute Poker/Ultimate Bet Entities.

WHEREFORE plaintiff, the United States of America, prays:

A. That process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to the law;

B. That a money judgment be entered against the PokerStars Entities in an amount not less than $1.5 billion;

C. That a money judgment be entered against the Full Tilt Poker Entities in an amount not less than $1 billion;

D.    That a money judgment be entered against the
Absolute Poker/Ultimate Bet Entities in an amount not less than
$500 million; and

E.    That this Court grant Plaintiff such further relief
as this court may deem just and proper, together with the costs
and disbursements of this action.

Dated: April 14, 2011
       New York, New York

                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York

                      By:   _____
                            SHARON COHEN LEVIN
                            MICHAEL D. LOCKARD
                            JASON H. COWLEY
                            Assistant United States Attorneys
                            One Saint Andrew's Plaza
                            New York, New York 10007
                            Tel.: (212) 637-1060
                            Facsimile: (212) 637-0421

67

## VERIFICATION

STATE OF NEW YORK               )
COUNTY OF NEW YORK          )
SOUTHERN DISTRICT OF NEW YORK  )

     ROSEMARY KARAKA, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation, and, as such, has responsibility for the within action; that she has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of her own knowledge, information, and belief.

     The sources of the deponent's information and the grounds for her belief are her personal knowledge and the official records and files of the United States Government.

Dated:  New York, New York
       April  , 2011

                            Rosemary Karaka
                            Special Agent
                            Federal Bureau of Investigation

Sworn to before me this
12th day of April, 2011

           Notary Public

**MICHAEL DENNIS LOCKARD**
**Notary Public, State of New York**
**No. 02LO6124541** Kings
**Qualified in New York County**
**Commission Expires March 28, 20 15**

## SCHEDULE A

### The Defendant Entities

1.   PokerStars,

2.   Full Tilt Poker,

3.   Absolute Poker,

4.   Ultimate Bet,

5.   Oldford Group Ltd.,

6.   Rational Entertainment Enterprises Ltd.,

7.   Pyr Software Ltd.,

8.   Stelekram Ltd.,

9.   Sphene International Ltd.,

10.  Tiltware LLC,

11.  Kolyma Corporation A.V.V.,

12.  Pocket Kings Ltd.,

13.  Pocket Kings Consulting Ltd.,

14.  Filco Ltd.,

15.  Vantage Ltd.,

16.  Ranston Ltd.,

17.  Mail Media Ltd.,

18.  Full Tilt Poker Ltd.,

19.  SGS Systems Inc.,

20.  Trust Services Ltd,

21.  Fiducia Exchange Ltd.,

22.  Blue Water Services Ltd.,

23.  Absolute Entertainment, S.A., and

24.   Blanca Games, Inc. of Antigua

### The Defendant Domains

25.   Pokerstars.com

26.   Fulltiltpoker.com

27.   Absolutepoker.com

28.   Ultimatebet.com

29.   Ub.com

### Poker Company Accounts

### The PokerStars Accounts

### The Sphene Accounts

1.   account numbered 27351910081015 held at Credit Agricole
     (Suisse) SA, Switzerland, in the name of Sphene
     International Limited, IBAN CH8908741014319300001, and all
     funds traceable thereto;

2.   account held at Credit Agricole (Suisse) SA, Switzerland, in
     the name of Sphene (International) Limited, IBAN
     CH6208741014319300002, and all funds traceable thereto;

3.   all accounts held at Bank Hapoalim (Suisse) SA, Luxembourg,
     in the name of Sphene International, and all funds traceable
     thereto;

### The Oldford Group Account

4.   account held at Credit Agricole (Suisse) SA, Switzerland, in
     the name of the Oldford Group Limited, IBAN
     CH1508741014093800001, and all funds traceable thereto;

### The Full Tilt Accounts

### The Tiltware Accounts

5.   account numbered  1892947126 held at Comerica Bank, Dallas,
     Texas, in the name of Tiltware, and all funds traceable
     thereto;

6.   account numbered 1892947134 held at Comerica Bank, Dallas,

2

Texas, in the name of Tiltware, and all funds traceable
thereto;

### The Kolyma Corporation Accounts

7.   account numbered E34512308000000007283 held at Wirecard Bank
     AG, Germany, in the name of Kolyma Corporation, and all
     funds traceable thereto;

8.   account numbered E79512308000000007249 held at Wirecard Bank
     AG, Germany, in the name of Kolyma Corporation, and all
     funds traceable thereto;

### The Ranston Accounts

9.   account held at Basler Kantonal Bank, Switzerland, in the
     name of Ranston Ltd., IBAN CH4900770016542263375, and all
     funds traceable thereto;

10.  account held at Basler Kantonal Bank, Switzerland, in the
     name of Ranston LTD, IBAN CH7000770016542254461, and all
     funds traceable thereto;

### The Mailmedia Account

11.  account held at Basler Kantonal Bank, Switzerland, in the
     name of Mailmedia, numbered CH7300770252534932001, and all
     funds traceable thereto;

### The Vantage Accounts

12.  account held at Banque Invik SA, Luxembourg, in the name of
     Vantage Limited, IBAN LU811944013080000USD, and all funds
     traceable thereto;

13.  any account held at Basler Kantonal Bank, Switzerland, in
     the name of Vantage Ltd., and all funds traceable thereto;

### The Filco Accounts

14.  account held at Allied Irish Bank in the name of Filco Ltd,
     IBAN IE85AIBK93006727971082, and all funds traceable
     thereto;

15.  account held at WestLB AG, Germany, in the name of Filco
     Ltd, IBAN DE19512308000000007262, and all funds traceable
     thereto;

3

### The Absolute Poker Accounts

#### The Blue Water Account

16. account numbered MT23SBMT5550500000001108 held at Sparkasse
Bank Malta in the name of Blue Water Services LTD, and all
funds traceable thereto;

#### The Towkiro Account

17. account numbered MT14SBMT55505000000011451GAEURO held at
Sparkasse Bank Malta in the name of Tokwiro Enterprises
ENRG, and all funds traceable thereto;

#### The Disora Accounts

18. account numbered 61-12-9436-6 held at Banco Pameno De La
Vivienda SA, Panama, in the name of Disora Investment, Inc.,
and all funds traceable thereto;

19. account numbered 0011271083 held at Citibank London,
England, in the name of Mundial Valores, for the benefit of
Disora Investment, Inc., MAM000804, and all funds traceable
thereto;

#### The Rintrade Account

20. account numbered CH4308755011432400000 held at Pictet and
Co., Switzerland, in the name of Rintrade Finance SA and all
funds traceable thereto;

#### The Pocket Kings Accounts

21. account numbered 99045014801116 held at Bank of Scotland
Ireland, Inc., Ireland, in the name of Pocket Kings
Consulting LTD, and all funds traceable thereto;

22. account numbered 99022000439546 held at National Irish Bank,
Ireland, in the name of Pocket Kings Ltd, and all funds
traceable thereto;

23. account numbered 99022000440162 held at National Irish Bank,
Ireland, in the name of Pocket Kings Ltd, and all funds
traceable thereto;

24. account numbered IE58IPBS9906291390203 held at Irish
Permanent Treasury, PLC, in the name of Pocket Kings, and
all funds traceable thereto;

4

25.  account numbered IE07DABA95151340074209 held at National
     Irish Bank in the name of Pocket Kings Limited, and all
     funds traceable thereto;

26.  account numbered IE38DABA95151340025151 held at National
     Irish Bank in the name of Pocket Kings Limited, and all
     funds traceable thereto;

27.  account numbered IE42DABA95151340062618 held at National
     Irish Bank in the name of Pocket Kings Limited, and all
     funds traceable thereto;

28.  account numbered IE58IPBS99062913190203 held at Irish
     Permanent Treasury in the name of Pocket Kings Limited, and
     all funds traceable thereto;

29.  account numbered IE67AIBK93208626257031 held at Allied Irish
     Bank in the name of Pocket Kings, and all funds traceable
     thereto;

30.  account numbered LU621944013130000USD held at Banque Invik,
     Luxemburg, held in the name of Pocket Kings Limited, and all
     funds traceable thereto;

31.  account numbered IE07DABA95151340074209 held at Danske Bank
     A/S, Denmark, held in the name Pocket Kings Ltd., and all
     funds traceable thereto.

5

## SCHEDULE B

## Poker Processor Accounts

### The Sunfirst Bank Accounts and Related Accounts

1.   account numbered 121015408 held at Sunfirst Bank, St.
     George, Utah, in the name of Triple Seven LP d/b/a
     Netwebfunds.com, and all funds traceable thereto;

2.   account numbered 121015390 held at Sunfirst Bank, St.
     George, Utah, in the name of Triple Seven LP d/b/a A WEB
     DEBIT, and all funds traceable thereto;

3.   account numbered 27351910081015 held at Societé Generale
     Cyprus LTD, Cyprus, in the name of Golden Shores Properties
     Limited, and all funds traceable thereto;

4.   account numbered CY1211501001065983USDCACC002 held at FBME
     Bank LTD, Cyprus, in the name of Triple Seven Inc., and all
     funds traceable thereto;

5.   account numbered 5510045221 held at Wells Fargo, N.A., in
     the name of Triple Seven L.P., and all funds traceable
     thereto;

6.   account numbered 7478010312 held at Wells Fargo, N.A., in
     the name of Kombi Capital, and all funds traceable thereto;

7.   account numbered 12900584 held at Sunfirst Bank, St. George,
     Utah, formerly in the name of Sunfirst Bank ITF Powder
     Monkeys/Full Tilt, now in the name of Sunfirst Bank, and all
     funds traceable thereto;

8.   account numbered 129000576 on deposit at Sunfirst Bank, St.
     George, Utah, formerly in the name of Sunfirst Bank ITF
     Mastery Merchant/Psars, now in the name of Sunfirst Bank,
     and all funds traceable thereto;

### The Elie Accounts and Related Accounts

9.   account numbered 200003291 held at All American Bank, Des
     Plaines, Illinois, in the name of 21 Debit LLC, and all
     funds traceable thereto;

10.  account numbered 200003317 held at All American Bank, Des
     Plaines, Illinois, in the name of 21 Debit LLC, and all
     funds traceable thereto;

11.  account numbered 200003325 held at All American Bank, Des
     Plaines, Illinois, in the name of 21 Debit LLC, and all
     funds traceable thereto;

12.  Account numbered 200003309 held at All American Bank, Des
     Plaines, Illinois, in the name of 21 Debit LLC, and all
     funds traceable thereto;

13.  account number 201002907 at Barclays Bank, UK in the name of
     Hotwire Financial LLC, and all funds traceable thereto;

14.  account number GB26BARC20473563472044 at Barclays Bank, UK,
     in the name of Hotwire Financial LTD, and all funds
     traceable thereto;

15.  account number 953500105 at Bank One Utah, in the name of
     4 A Consulting, and all funds traceable thereto;

16.  account number 730666271, at Whitney National Bank, New
     Orleans, Louisiana in the name of Ndeka LLC, and all funds
     traceable thereto;

17.  account number 2919208124 at Bank of America, N.A. in the
     name of Credit Capital Funding, and all funds traceable
     thereto;

18.  account numbered 32433 at New City Bank in the name of
     21Debit LLC dba PS Payments, and all funds traceable
     thereto;

19.  account numbered 32441 at New City Bank in the name of
     21Debit LLC dba FLT Payments, and all funds traceable
     thereto;

20.  account number 32506 at New City Bank in the name of 21Debit
     LLC, and all funds traceable thereto;

                The Griting Account and Related Account

21.  account numbered 972402309 held at UMPQUA Bank, Roseburg,
     Oregon, in the name of "ULTRA SAFE PAY," and all property
     traceable thereto;

22.  account numbered 004-411-346034-838 held at Hong Kong and
     Shanghai Banking Corporation, Hong Kong, in the name of
     Griting Investments LTD, and all funds traceable thereto;

                                  2

### The Vensure/Trinity Global Accounts

23.  account numbered 1093 held at Vensure Federal Credit Union, Mesa, Arizona, in the name of Trinity Global Commerce Corp.

24.  account numbered 1200402039 held at Banca Privada D'Andorra, Andorra, in the name of Trinity Global Commerce Corp., and all funds traceable thereto;

25.  account numbered MT54SBMT55505000000016782GAUSD0 held at Sparkasse Bank Malta PLC, Malta, in the name of Trinity Global Commerce Corp., and all funds traceable thereto;

### The Terricorp Inc. d/b/a/ TLC Global Accounts and Related Accounts

26.  account numbered 27554003786 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

27.  account numbered 27554003760 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

28.  account numbered 27554001038 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

29.  account numbered 27551017789 held at Royal Bank of Canada, Canada, in the in the name of Terricorp Inc. d/b/a TLC Global, and all funds traceable thereto;

30.  account numbered 4800198399 held at Harris Bank, Palatine, Illinois, and all funds traceable thereto;

31.  account numbered GB81RBOS16630000368036 held at the Royal Bank of Scotland in the name of Voltrex Ltd., and all funds traceable thereto;

32.  account numbered 2000059819596 held at Wachovia Bank, a division of Wells Fargo Bank, N.A., in the name "Eastern Expressions," and all funds traceable thereto;

33.  account numbered 104773862842 held at Bendix Foreign Exchange, Toronto, Ontario, and all funds traceable thereto.

## The G.I. Holdings Accounts

34. $231,000.00 formerly on deposit at First Republic Bank in Account numbered 80000373283, held in the name of G.I. Holdings and all property traceable thereto;

35. $124,178.72 formerly on deposit at Service 1st Bank of Nevada in Account numbered 2020003792 held in the name of G.I. Holdings and all property traceable thereto;

36. $2,057,620.28 formerly on deposit at Wells Fargo Bank in Account numbered 5383346862 held in the name of G.I. Holdings and all property traceable thereto;

37. $3,055,108.21 formerly on deposit at Citibank in account numbered 203023239 held in the name of G.I. Holdings and all property traceable thereto;

38. $784,160.95 formerly on deposit at Citibank in account numbered 203118542 held in the name of G.I. Holdings and all property traceable thereto;

39. $1,000.00 formerly on deposit at Citibank in account numbered 203118559 held in the name of G.I. Holdings and all property traceable thereto;

40. $925.00 formerly on deposit at Citibank in account numbered 203118575 held in the name of G.I. Holdings and all property traceable thereto;

41. $1,035,415.44 formerly on deposit at Nevada  Commerce Bank in account numbered 0021002712 held in the name of G.I. Holdings and all property traceable thereto;

42. $122,308.78 formerly on deposit at Nevada Commerce Bank in account numbered 0021002795 held in the name of G.I. Holdings and all property traceable thereto;

43. $3,029,711.94 formerly on deposit at City National Bank in Account Number 3701177950, held in the name of G.I. and all property traceable thereto;

## The SNR Inc. Accounts

44. $30.27 formerly on deposit at Huntington National Bank in Account numbered 01662184444. held in the name of SNR, Inc. and all property traceable thereto;

4

45. $1,057,797.29 formerly on deposit at Huntington National Bank in account numbered 01662184457 held in the name of SNR, Inc. and all property traceable thereto;

46. $649,261.20 formerly on deposit at Huntington National Bank in Account numbered 01662191343 held in the name of SNR, Inc. and all property traceable thereto;

47. $199,175.14 formerly on deposit at Bank of West in account numbered 658049382 held in the name of SNR, Inc. and all property traceable thereto;

48. $4,925.00 formerly on deposit at Bank of America in account numbered 0952071585 held in the name of SNR, Inc. and all property traceable thereto;

49. $25.00 formerly on deposit at Bank of America account numbered 0952071603, held in the name of SNR, Inc. and all property traceable thereto;

50. $992,499.53 formerly on deposit at Citibank in Account numbered 203366638 held in the name of SNR, Inc. and all property traceable thereto;

51. $865,000.00 formerly on deposit at Bank of America in account numbered 0952071467, held in the name of SNR, Inc. and all property traceable thereto;

### The Viable Marketing Accounts

52. $410,449.93 formerly on deposit at Bank of America Account numbered 229006067857 held in the name of Viable Marketing Corp. and all property traceable thereto;

53. $8,168,168.89 formerly on deposit at Fifth Third Bank in Account numbered 7431859508, held in the name of Viable Marketing Corp. and all property traceable thereto;

54. $40,960.86 formerly on deposit at Fifth Third Bank in Account numbered 7432618069, held in the name of Viable Marketing Corp. and all property traceable thereto;

### The Viable Processing Solutions Accounts

55. All funds formerly on deposit at National Bank of California in account numbered 2547716 in the name of Viable Processing Solutions, and all property traceable thereto;

5

56.   All funds formerly on deposit at National Bank of California
      in Account Number 2778815 held in the name of Viable
      Processing Solutions, and all property traceable thereto;

                 The ASP Consultants, LLC Accounts

57.   $447,196.79 from account numbered 804815470 in the name of
      ASP Consultants, LLC at JPMorgan and all property traceable
      thereto;

58.   $12,642.44 from account numbered 804815488 in the name of
      ASP Consultants, LLC at JPMorgan and all property traceable
      thereto;

59.   $4,472.58 from account numbered 822823779 in the name of ASP
      Consultants, LLC at JPMorgan and all property traceable
      thereto;

60.   $84.21 from account numbered 822824025 in the name of ASP
      Consultants, LLC at JPMorgan and all property traceable
      thereto;

61.   $6,047.84 from account numbered 822824140 in the name of ASP
      Consultants, LLC at JPMorgan and all property traceable
      thereto;

62.   $17,460.95 from account numbered 1003245502 in the name of
      ASP Consultants, LLC at JPMorgan and all property traceable
      thereto;
                    The LST Financial Accounts

63.   All funds formerly on deposit at Four Oaks Bank and Trust
      Company, Four Oaks, North Carolina, in account numbered
      520055501, held in the name of LST Financial, and all
      property traceable thereto;

64.   All funds formerly on deposit at Four Oaks Bank and Trust
      Company, Four Oaks, North Carolina, in account numbered
      520057101, held in the name of LST Financial, and all
      property traceable thereto;

65.   All funds formerly on deposit at Four Oaks Bank and Trust
      Company, Four Oaks, North Carolina, in account numbered
      520064401, held in the name of LST Financial, and all
      property traceable thereto;

66.   All funds formerly on deposit at Four Oaks Bank and Trust
      Company, Four Oaks, North Carolina, in account numbered

520065201, held in the name of LST Financial, and all
property traceable thereto;

67.   All funds formerly on deposit at Four Oaks Bank and Trust
Company, Four Oaks, North Carolina, in account numbered
520069501, held in the name of LST Financial, and all
property traceable thereto;

<u>The EZO Account</u>

68.   $33,743.75 formerly on deposit at Bank of America Account
numbered 003678667131 held in the name of EZO, LLC and all
property traceable thereto;

<u>The Autoscribe Account</u>

69.   $8,018.04 from Bank Account numbered 9105709543 in the name
of Autoscribe Corporation at Citibank, N.A. and all property
traceable thereto;

<u>The MAS Inc. Account</u>

70.   All funds formerly on deposit at Hawaii National Bank,
Honolulu, Hawaii, in account numbered 12008656, held in the
name of "MAS Inc.", and all property traceable thereto.

7